67 A.3d 716

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Laquaille BRYANT, Appellant.**

Supreme Court of Pennsylvania.

Argued March 7, 2012.

Decided May 28, 2013.

220

224

David Scott Rudenstein, for Appellant.

Hugh J. Burns, Philadelphia, William George Young, Philadelphia District Attorney's Office, Philadelphia, Amy Zapp, PA Office of Attorney General, Harrisburg, for Appellee.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice McCAFFERY.

This is a direct appeal from the judgment of sentence of death on two counts of first-degree murder. We affirm.

On April 21, 2010, Laquaille Bryant ("Appellant") pled guilty to two counts of first-degree murder in the January 19, 2008 shooting deaths of Chante Wright [1] and Octavia Green, as well as to one count each of intimidation of a witness, possession of a firearm, and possession of an instrument of crime.[2] The Commonwealth's theory of the case was that Appellant killed Ms. Wright at the behest of one Hakeem Bey to prevent her from testifying at Bey's trial for the murder of one Moses Williams. Following a penalty-phase hearing, the jury found three aggravating circumstances with respect to the murder of Ms. Wright, to wit, convicted of another murder, 42 Pa.C.S. § 9711(d)(11); killing in retaliation against a witness, 42 Pa. C.S. § 9711(d)(15); and paid by another person for the killing of the victim, 42 Pa.C.S. § 9711(d)(2). The jury found only the first aggravating circumstance, *i.e.* convicted of another murder, with respect to the murder of Ms. Green. In both cases, the jury found a single mitigating circumstance, the "catchall" provision set forth in 42 Pa.C.S. § 9711(e)(8).[3] The jury returned with a verdict of death for each murder, and the trial court formally imposed sentence on May 5, 2010, immediately after the verdict.

Appellant now appeals to this Court, pursuant to 42 Pa.C.S. § 9711(h)(1),[4] seeking a new penalty-phase hearing based on the following three issues, which we reproduce verbatim:

1. In some documents of record, Chante Wright is referred to as Chante Jackson. *See, e.g.,* Trial Court Opinion, dated 5/13/2011, at 1 n. 1. Chante Jackson was the name provided to Chante Wright when she entered the federal witness relocation program and was relocated to Florida.

2. Respectively 18 Pa.C.S. §§ 2502(a), 4952(a)(1), 6105(a)(1), 907(a).

3. The jury specifically cited as mitigating factors under subsection 9711(e)(8) Appellant's life circumstances, including his drug use, his cognitive deficiencies, and the home/neighborhood environment into which he was born. *See* Sentencing Verdict Slips at 5; Notes of Testimony ("N.T."), 5/5/10, at 9 and 13.

4. "A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules." 42 Pa.C.S. § 9711(h)(1).

I. Should the defendant be awarded a new penalty phase hearing as a result of the Suppression Court's ruling which denied a Motion to Suppress the defendant's statement, and where the statement was used against the defendant at the penalty phase which considered whether the defendant had committed a contract murder or murder for hire?

II. Is the defendant entitled to a new penalty phase hearing as the result of Court error where the Court permitted extremely inflammatory and prejudicial photographs of the victim, living at that time, to be introduced into the penalty phase hearing?

III. Is the defendant entitled to a new penalty phase hearing as the result of prosecutorial misconduct during that hearing where the Prosecutor pandered to the jury; inappropriately commented on the defendant's lack of remorse; misstated the evidence; and engaged in rhetoric concerning another and unrelated case?

Appellant's Brief at 3 ("Questions Presented").

## SUFFICIENCY OF THE EVIDENCE

This Court has a self-imposed duty in all capital cases to conduct an independent review of the sufficiency of the evidence to sustain a conviction for first-degree murder, a duty that is not abrogated when a defendant has pled guilty to first-degree murder. *See, e.g., Commonwealth v. Fears,* 575 Pa. 281, 836 A.2d 52, 59 (2003) (conducting a sufficiency review on direct appeal in a capital case by considering the evidence that was presented at the appellant's suppression hearing and summarized by the Commonwealth at his guilty plea colloquy); *Commonwealth v. Singley,* 582 Pa. 5, 868 A.2d 403, 407–09 (2005) (in a double murder case where the appellant pled guilty to first-degree murder in the death of the first victim and to murder generally in the death of the second victim, conducting a sufficiency review by considering the evidence that was presented at the appellant's guilty plea, degree of guilt hearing, and penalty phase hearing); *Commonwealth v. Ockenhouse,* 562 Pa. 481, 756 A.2d 1130, 1133–35 (2000) (in a

case where the appellant entered a guilty plea to first-degree murder on the first day of trial, conducting a sufficiency review by considering the appellant's confession, presented at trial); *Commonwealth v. Michael*, 544 Pa. 105, 674 A.2d 1044, 1045–47 (1996) (in a case where the appellant pled guilty to first-degree murder during the *voir dire* phase of trial, conducting a sufficiency review by considering testimony presented at the appellant's preliminary hearing as well as the appellant's testimony at his guilty plea hearing).

To sustain Appellant's plea to first-degree murder, we must conclude that the Commonwealth's evidence, and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, proved beyond a reasonable doubt the three elements of first-degree murder, which are as follows: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Houser*, 610 Pa. 264, 18 A.3d 1128, 1133 (2011). First-degree murder is an intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a) and (d); *Fears, supra* at 59. Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Houser, supra* at 1133–34; *Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 306–07 (2011); *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 130–31 (2008). Recently, in *Briggs, supra* at 307, we concluded that the appellant's specific intent to kill was established by his deliberate and repeated shots to the chest and/or abdomen of the victims.

Here, after the jury had been selected for trial, Appellant indicated his intention to plead guilty to two counts of first-degree murder and other charges. Notes of Testimony ("N.T."), 4/21/10, at 6. After an extensive colloquy, conducted by the defense and the court, *see id.* at 6–17, the Commonwealth summarized before the court the evidence that would be presented were the matter to proceed to trial, as follows. *Id.* at 17–30.

■ Shortly after 2:00 a.m. on January 19, 2008, in South Philadelphia, police discovered the bodies of Chante Wright and Octavia Green, respectively on the sidewalk and in the passenger seat of a nearby vehicle. Both women had been shot multiple times from the back seat of the vehicle, and their deaths resulted from the gunshot wounds. *Id.* at 17–19. Appellant's fingerprint was found on the rear passenger side of the vehicle, just above the door handle. *Id.* at 22.

Ms. Wright was a witness for the Commonwealth against an individual named Hakeem Bey, whose homicide trial was scheduled for March 2008. On the night of January 18, 2008, only hours before she was murdered, Ms. Wright had returned to Philadelphia from Florida, where she had been relocated as part of the federal witness relocation program. *Id.* at 19–20.

Cell phone records established that in January 2008, there were a series of calls among phones belonging to Appellant; both victims; and one Malik Bennett, who, at the time, was in a federal halfway house in Philadelphia. *Id.* at 20–23. On January 18, 2008, the day before the murders, there were numerous calls between Appellant and Bennett and between Appellant and Ms. Wright. Shortly before midnight on January 18, 2008, there was a call from Bennett's phone to Hakeem Bey's phone, and immediately thereafter a call from Bennett's phone to Appellant's phone. *Id.* at 23–24. FBI Agent Shute, an expert in the field of cell phone and cell site analysis, would have testified that during the time leading up to the murders, cell phones belonging to Appellant and both of the victims were traveling around the city together. *Id.* at 28–29. At 2:06 a.m. on January 19, 2008, which was approximately two minutes after the murders, there was a call from Appellant's phone to Bennett's phone, and Agent Shute would have further testified that this call was placed from an area near the location of the murders. *Id.* at 24, 29. Around 10:00 a.m. on the day of the murders, there were multiple calls between Bennett's phone and Hakeem Bey's phone, as well as between Bennett's phone and Appellant's phone. *Id.* at 24. Shortly thereafter, there was a call from Hakeem Bey's phone to

Appellant's girlfriend's phone, followed by several return calls from the latter to the former. *Id.* at 24.

The Commonwealth would have also called several witnesses who knew Appellant and had seen him at various times before or after the murders. Jahmeia Harrell would have testified that on the weekend following the murders, she overheard a phone conversation between Appellant and Bennett in which Appellant stated that he had to get his money and Bennett had to "get with his man." *Id.* at 25. Denise Wilson would have testified that a few hours before the murders, she was with Appellant at a bar in South Philadelphia when he received a phone call from Ms. Wright, and he said that she "was going to put him on some money." *Id.* Ms. Wilson would have further testified that at approximately 2:00 a.m. on the morning of the murders, Appellant came to her house with what appeared to be blood on his sneaker. At that time, Appellant called Bennett and told him "It's cool. We're going to be eating now." *Id.* at 26. Finally Ms. Wilson would have testified that she had previously seen Appellant with a revolver in his possession. *Id.* A firearms expert would have testified, from ballistics evidence recovered from the scene of the murders, that the murder weapon was a revolver. *Id.*

Aisha Kinney, Appellant's girlfriend and the mother of his daughter, would have testified to the following. Appellant told her a few days after the murder that he had done a job and was going to get paid. He also told her that he knew police were asking questions, and he asked her to burn the coat she had seen him wearing shortly after the murders. She soaked the coat in lighter fluid in the backyard, but did not burn it; police recovered the coat and a can of lighter fluid during their investigation. She also remembered seeing Appellant in her house the evening prior to the murders and remembered him returning to her home about 8:00 or 9:00 the next morning. *Id.* at 27–28.

Immediately after this recitation of the evidence that the Commonwealth would have presented at the guilt phase of trial, Appellant pled guilty to two counts of first-degree mur-

der.[5] *Id.* at 30–34. Appellant specifically agreed that the Commonwealth's evidence established each element of first-degree murder. *Id.* at 31. We conclude that the Commonwealth's evidence, and all reasonable inferences deducible therefrom, was indeed sufficient to establish beyond a reasonable doubt each element of the first-degree murders of Ms. Wright and Ms. Green.[6] We turn now to the issues raised by Appellant.

## SUPPRESSION OF APPELLANT'S STATEMENT TO POLICE

In Appellant's first issue, he claims that an inculpatory statement he gave to police on February 8, 2008, was involuntary and not the product of his free will; therefore, Appellant further asserts, the trial court erred by admitting it into evidence. Appellant's Brief at 12. In this statement to police, Appellant confessed to the killing of Ms. Wright and Ms. Green, but he denied acting at the behest of Hakeem Bey or for monetary reward. Prior to trial, Appellant filed a motion to suppress his inculpatory statement, which the trial court denied after holding a two-day evidentiary hearing. *See* N.T. Suppression Hearing, 3/24/10 and 3/30/10. During the penalty

5. Appellant also pled guilty to intimidation of a witness and firearms charges. N.T., 4/21/10, at 33–34. These charges are not at issue here.

6. During the penalty-phase hearing, the Commonwealth presented the evidence that it had summarized in its proffer during the guilty plea. *See* N.T., 4/26/10, at 48–75 (testimony of Dr. Collins who performed autopsies on the victims); N.T., 4/21/10, at 85–89 (testimony of Officer Christopher Leary, who responded to the call of a shooting and discovered the victims' bodies); N.T., 4/23/10, at 50–105 (Assigned Detective John Verrecchio's testimony regarding where the victims were shot and also regarding the recovery of the cell phones and analysis of the cell phone records); *Id.* at 42 and N.T., 4/21/10, at 116, 122 (testimony and counsel's stipulation as to the presence and location of Appellant's fingerprint on the vehicle involved in the murder); N.T., 4/22/10, at 57, 63–66, and N.T., 4/23/10, at 58, 81 (testimony as to Ms. Wright's participation in the federal witness protection program and her planned testimony against Hakeem Bey); N.T., 4/23/10, at 160–62 (Agent Shute's testimony as to the location of Appellant's cell phone around the time of the murders); N.T., 4/26/10, at 9–17 (testimony of Denise Wilson); N.T., 4/23/10, at 11–13, 21–28 (testimony of Jahmeia Harrell); and N.T., 4/22/10, at 29–30, 33–36, 41–42 (testimony of Aisha Kinney).

phase of trial, the Commonwealth introduced the statement into evidence, and the detective who took the statement read his questions and Appellant's responses into the record. *See* N.T., 4/28/10, at 21–38; Commonwealth Exhibit 73 (C–73).[7] Before this Court, Appellant argues that his inculpatory statement was involuntary and thus should not have been admitted into evidence because, prior to giving the statement, he had been in custody for approximately thirty hours; kept in isolation, with little to eat or drink and no place to sleep; and subjected to repeated interrogation to convince him that he would not leave the police station until he confessed. Appellant's Brief at 12–17.

The legal principles relevant to Appellant's claim are as follows. The test for determining the voluntariness, and thus the admissibility, of an accused's statement is the totality of the circumstances surrounding the statement. *Commonwealth v. Perez*, 577 Pa. 360, 845 A.2d 779, 787 (2004). The mere fact that there is some passage of time between when an accused is arrested and when he or she gives an inculpatory statement does not constitute grounds for suppression of the statement. *Id.* This Court has set forth the following numerous factors that should be considered under a totality of the circumstances test to determine whether a statement was freely and voluntarily made: the duration and means of interrogation, including whether questioning was repeated, prolonged, or accompanied by physical abuse or threats thereof; the length of the accused's detention prior to the confession; whether the accused was advised of his or her constitutional rights; the attitude exhibited by the police during the interrogation; the accused's physical and psychological state, including whether he or she was injured, ill, drugged, or intoxicated; the conditions attendant to the detention, includ-

7. The defense had previously introduced Appellant's inculpatory statement into evidence during cross-examination of the detective assigned to this case in order to show Appellant's early remorse and acceptance of responsibility. *See* N.T., 4/23/10, at 119–23 (introducing Appellant's statement and questioning the witness about it to make the point that Appellant had waived his rights when he gave his statement of confession).

ing whether the accused was deprived of food, drink, sleep, or medical attention; the age, education, and intelligence of the accused; the experience of the accused with law enforcement and the criminal justice system; and any other factors which might serve to drain one's powers of resistance to suggestion and coercion. *Id.* at 785, 787.

When we review the denial of a suppression motion, we are guided by the following principles:

[O]ur initial task is to determine whether the [trial court's] factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Id.* at 788 (citation omitted).

Here, during the evidentiary hearing on Appellant's motion to suppress his inculpatory statement, the Commonwealth proffered the following witnesses: Detective Joseph Bamberski, who took an initial statement from Appellant in which he denied any involvement in the murders; Detective John Harkins, who subsequently took Appellant's second, inculpatory statement; and Detective Verrecchio, the assigned detective in the investigation of the murders of Ms. Wright and Ms. Green. *See* N.T. Suppression Hearing, 3/24/10, at 4–92, and 3/30/10, at 5–55. The defense presented no witnesses, but simply argued that Appellant's inculpatory statement was coerced and involuntary because he had been in custody for approximately 34 hours prior to making the statement.[8] N.T. Suppression Hearing, 3/30/10, at 56–57.

---

8. During the suppression hearing, the defense also argued that Appellant had been arrested without probable cause. The trial court rejected this argument after considering all the evidence that police investigators had uncovered linking Appellant to the victims and the scene of the murders. *See* N.T., 3/30/10, at 56, 62–65. The question of probable cause for arrest is not at issue in this appeal.

■ The trial court issued its decision denying Appellant's suppression motion at the close of the second day of the hearing, expressly holding that the detectives were credible witnesses, that Appellant had not been deprived during his time in custody, and that his statement was voluntary. *Id.* at 70. Specifically, the trial court made the following factual findings. On February 7, 2008, Appellant was taken into custody when police officers unexpectedly found him at Aisha Kinney's residence, where they had gone to look for a cell phone linked to the murders. Although Appellant was held for a lengthy period of time prior to giving his inculpatory statement, part of the reason for this was the enormous amount of evidence potentially relevant to the murders that the detectives were continuing to analyze. While Appellant was in custody, he was given food and drink, he was allowed to use a bathroom, he was given the opportunity to sleep and did in fact sleep. No psychological pressure was placed on Appellant during his time in custody. Prior to giving each of his statements, Appellant had been read his *Miranda* rights and had signed off on them. Prior to giving his inculpatory statement, Appellant had been permitted to speak to Ms. Kinney, whom he referred to as his "wife." At the end of their private meeting, a detective overheard her tell Appellant to tell the truth when he asked her what he should do. Very shortly thereafter, Appellant gave the statement in which he admitted killing Ms. Wright and Ms. Green. *Id.* at 66–69; *see also* Trial Court Opinion at 3–4 (citing *Perez*'s totality of the circumstances test and holding that Appellant had not been coerced into confessing and that his will had not been overborne).

The trial court's findings are supported by the record and there was no legal error. Accordingly, we affirm the trial court's denial of Appellant's suppression motion and decline to grant Appellant relief.

## PHOTOGRAPHS OF THE VICTIM'S CHILDREN

In Appellant's second issue, he claims that the trial court erred by permitting two photographs of Ms. Green's two

children to be admitted into evidence and shown to the jury during the victim impact portion of the Commonwealth's case.[9] Appellant asserts that the two photographs were irrelevant and inflammatory and merely engendered sympathy in the hearts of the jurors. Appellant's Brief at 18–20. The trial court concluded that the photographs were relevant to show the jury those persons who were directly impacted by the murders and to illustrate their young ages. N.T., 4/28/10, at 48; Trial Court Opinion at 4.

The United States Supreme Court has recognized that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In this Commonwealth, pursuant to 42 Pa.C.S. § 9711(a)(2), "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible" during the penalty phase of a capital trial. Regarding subsec-

9. In Appellant's statement of the question presented in Issue 2, he challenges the admission of "extremely inflammatory and prejudicial photographs of the *victim*, living at that time." Appellant's Brief at 3 (Questions Presented, Question II) (emphasis added); *see also* Appellant's Brief at 18 (in the title of the argument section for Issue 2, challenging "certain inflammatory photographs of the *victim*, while alive") (emphasis added). However, in his discussion of this issue, Appellant does not mention any photographs of the victims, and our review of the record reveals no indication that any photographs of the victims were admitted into evidence or shown to the jury.

In fact, the record shows that the trial court refused to admit a photograph of one of the victims, Ms. Green, with her son seated on her lap. With this photograph, the Commonwealth had sought to show the jury "a visual of what Ms. Green looks like," but the trial court denied the Commonwealth's request. N.T., 4/28/10, at 49.

Before this Court, Appellant specifically challenges only two photographs, Commonwealth Exhibits 74 and 75 (C–74 and C–75), which are photographs of Ms. Green's son and daughter, respectively. Appellant's Brief at 18, 20. In his brief, Appellant does not challenge a photograph of Ms. Wright's young son, which was made a part of the record with counsel's stipulation just before closing arguments began. N.T., 5/4/10, at 119–20 (entering the photograph of Ms. Wright's son into the record as Commonwealth Exhibit 79). Defense counsel did not object to the admission of this photograph. Furthermore, as the Commonwealth points out, it is unclear from the record whether this photograph was ever shown to the jury. *See* Commonwealth's Brief at 31 n. 8.

tion 9711(a)(2), this Court has concluded that "[t]estimony that is a personal account describing the devastating impact the murders had on the surviving families is wholly appropriate and admissible at the sentencing phase of a capital case." *Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 634 (2010) (citation omitted).

 Admission of evidence, including victim impact evidence, rests within the sound discretion of the trial court, which must balance evidentiary value against the potential dangers of unfairly prejudicing the accused, inflaming the passions of the jury, or confusing the jury. *Id.* at 623; *Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122, 1139 (2007). We reaffirm our confidence in our trial judges to oversee the presentation of evidence "so that overtly passionate, intentionally biased and inflammatory material is kept out of the courtroom." *Eichinger, supra* at 1139. We will reverse a trial court's decision as to admissibility of evidence only if the appellant sustains the "heavy burden" to show that the trial court has abused its discretion. *Id.* at 1140; *see also Flor, supra* at 623, 634. We have explained the abuse of discretion standard as follows:

> It is not sufficient to persuade the appellate court that it might have reached a different conclusion[;] it is necessary to show an actual abuse of the discretionary power. An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion [that] overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Eichinger, supra* at 1140.

 Here, during the victim impact portion of its case, the Commonwealth called four witnesses: Daisy Pough, grandmother of Chante Wright, who after Ms. Wright's death, assumed the responsibility for raising her then six-year-old son; Kathleen Webb, mother of Octavia Green, who had custody of and was raising Ms. Green's son and daughter, then seven- and four-years-old, respectively; Markeyia Sorden, sis-

ter of Ms. Wright; and Michael Green, father of Ms. Green. N.T., 4/28/10, at 54–77. None of the three children of the victims testified. However, during Ms. Webb's testimony concerning her grandchildren's response to their mother's death, one photograph of each of the two children was shown briefly to the jury. *Id.* at 61–62.

We cannot conclude that the trial court abused its discretion by briefly showing the jury a photograph of each of Ms. Green's two young children during their grandmother/caretaker's victim impact testimony concerning the effect of their mother's murder on their behavior. Because the children did not testify themselves, their photographs constituted the only means by which the Commonwealth could show the jury those individuals who were arguably most affected by Appellant's offense, and thus put a human face on the harm it caused. We cannot conclude that this was an abuse of discretion.

## ALLEGED PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT

In Appellant's third and final issue, he alleges "repeated and deliberate" prosecutorial misconduct during closing argument, and he seeks, as remedy, a new trial. Appellant's Brief at 21. During the prosecutor's closing argument, defense counsel raised several objections that the trial court sustained. At the end of the argument, defense counsel moved for a mistrial based on the "seriousness" of the sustained objections. N.T., 5/4/10, at 173. The trial court denied Appellant's motion, reasoning that the objections had been sustained and the prosecutor cautioned "to move along." *Id.* In its opinion, the trial court held that any prejudice generated by the challenged remarks was "ameliorated" by the court's sustaining of the objections, and furthermore, that, even if the defense objections had not been sustained, no relief was due "because the [prosecutor's] remarks were not so egregious so as to deny [Appellant] a fair penalty hearing." Trial Court Opinion at 9. Before this Court, Appellant claims that the trial court erred in denying his motion for a mistrial based on four sustained

objections to the prosecutor's statements during closing argument.

 Appellant specifically raises the following four allegations of prosecutorial misconduct during closing argument: (a) comments concerning Appellant's lack of remorse; (b) an incorrect recitation of Ms. Kinney's testimony; (c) a statement that the Commonwealth did not have sufficient funds to protect a witness in a state witness relocation program; (d) comparison of Appellant's sentence to the sentence imposed on Hakeem Bey.[10] Before addressing each of these subclaims, we summarize the well-established legal standard for prosecutorial misconduct.

> Comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in [the jurors'] minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict.

*Commonwealth v. Hutchinson,* 611 Pa. 280, 25 A.3d 277, 307 (2011) (citation omitted).

 While it is improper for a prosecutor to offer any personal opinion as to guilt of the defendant or credibility of the witnesses, it is entirely proper for the prosecutor to summarize the evidence presented, to offer reasonable deductions and inferences from the evidence, and to argue that the evidence establishes the defendant's guilt. *Id.* at 306–07; *Commonwealth v. Chamberlain,* 612 Pa. 107, 30 A.3d 381, 408 (2011). In addition, the prosecutor must be allowed to respond to defense counsel's arguments, and any challenged statement must be viewed not in isolation, but in the context in which it was offered. *Hutchinson, supra* at 307. "[The] prosecutor must be free to present his or her arguments with logical force and vigor." *Id.* at 306–07 (citation omitted). Within reasonable bounds, the prosecutor may employ oratorical flair and impassioned argument when commenting on the evidence or presenting the case for imposition of the death

**10.** Appellant's subclaims have been reordered for ease of disposition.

238

penalty. *Commonwealth v. Paddy,* 609 Pa. 272, 15 A.3d 431, 458–59 (2011).

It is also well established that "[a] trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Chamberlain, supra* at 422 (citation and internal quotation marks omitted); *see also Commonwealth v. Travaglia,* 611 Pa. 481, 28 A.3d 868, 879 (2011) ("A mistrial is an extreme remedy that is required only where the challenged event deprived the accused of a fair and impartial trial."). When the trial court gives adequate cautionary instructions, declaration of a mistrial is not necessary. *Chamberlain, supra.* In reviewing a trial court's denial of a motion for a mistrial, our standard is abuse of discretion. *Id.; Travaglia, supra; Commonwealth v. Gease,* 548 Pa. 165, 696 A.2d 130, 134 (1997) (stating that when we review a trial court's denial of a motion for a new trial based on alleged prosecutorial misconduct, our standard is abuse of discretion); *see* text *supra* for delineation of abuse of discretion standard.

In Appellant's first subclaim under this issue, he challenges the prosecutor's comments about his lack of remorse. The specific comments are as follows, placed in proper context.

*Prosecutor:* You will hear them say remorse because [Appellant] pled guilty. Well, you heard this case. All his girls gave him up. His fingerprint gave him up. His DNA gave him up. The cell phone records gave him up. His confession gave him up.

*When you were picked here, remember it was for a trial. Remember that? You had to decide guilt or innocence. But when I found everybody, and I mean it, when I had you and he looks and going, wow, I don't think I can pull the wool over their eyes, it was not, I'm sorry, I have remorse. It is, I give up, I surrender, you got me, you can't beat me, so let me go to plan B. I will say I am guilty,*

*and that's remorse. Have you seen any sorrow, any apology in this man?*

*Defense Counsel:* Objection.

*The Court:* Sustained.

*Prosecutor: I say, when they say remorse that he pled guilty, no. That was, I surrender, you got me cold. I can't beat you.*

N.T., 5/4/10, at 135 (closing argument) (emphasis added to that portion of the prosecutor's argument quoted in Appellant's Brief at 22–23).

*Prosecutor:* And [Appellant] tells about the murder. But as a stand-up, strong guy, because he is part of this crew, I did it all. She is not a witness against me, but I killed her anyway. I don't know Hakeem Bey. But you heard Aisha, they went to school together. I don't know Hakeem Bey, but I called his phone a whole bunch of times. I did it all and I don't know why. [Appellant] is keeping them clear.

I know there was money to kill [Chante Wright]. Think of that. Chante knew people wanted to kill her. There was a price on her head. And he keeps them out of it.

*So when you think of remorse? You heard testimony, Hakeem Bey and Malik Bennett have not been arrested for killing those girls. Those cell phones, you know for a fact, without a doubt, that was a planning, let's do it, do it and here is your money. But I can't lock them up. They can't lock them up. Who can tell us about those phone calls? Remorse? I'm sorry?*

*Defense Counsel:* Objection.

*The Court:* Objection sustained. Move on.

*Prosecutor:* [Appellant] takes the blame for everything and keeps his personality.

*Id.* at 158–59 (closing argument) (emphasis added to that portion of the prosecutor's argument quoted in Appellant's Brief at 23).

Appellant asserts that the prosecutor's comments about lack of remorse were "certainly" an attempt "to generate bias and

hostility in the jurors" because Appellant had demonstrated "exquisite remorse" by confessing to a homicide detective and then pleading guilty to two counts of first-degree murder in open court. Appellant's Brief at 22. The Commonwealth argues that the prosecutor's comments concerning lack of remorse were appropriately made in anticipation of the defense argument that Appellant showed his remorse by pleading guilty. Commonwealth's Brief at 39–40.

Although the trial court granted the defense objections to the above remarks, the court refused to grant a mistrial. In its opinion, the trial court clarified that it had sustained the defense objection because the prosecutor was expressing his personal opinion as to Appellant's lack of remorse, not because the prosecutor was arguing that Appellant lacked remorse. Trial Court Opinion at 9–10 n.2. As the trial court recognized, a prosecutor is permitted to address a defendant's lack of remorse. *Id.* at 9 (quoting *Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 141 (2001) for the proposition that the Commonwealth may argue at the penalty phase "that a defendant showed no sympathy or remorse, so long as it is not an extensive tirade"), and also (citing *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1378 (1991) for the proposition that a defendant's lack of remorse could be relevant to the jury's assessment of the presence of any mitigating factors). The trial court concluded that because the prosecutor's comments were not lengthy or extensive and Appellant had indeed shown no remorse during the penalty phase, the challenged comments did not warrant the grant of a mistrial, *i.e.*, they did not deprive Appellant of a fair and impartial trial. *Id.* at 8–9.

We conclude that the trial court's ruling did not constitute an abuse of its discretion. We note only that, consistent with the Commonwealth's argument, defense counsel had strongly and repeatedly argued in his opening statement to the jury that Appellant's guilty pleas in open court revealed his remorse, sorrow, regret, and acceptance of re-

sponsibility.[11] The prosecutor's challenged comments suggested to the jury an alternative prism through which to consider and assess Appellant's confession and guilty pleas. Appellant is entitled to no relief on his first subclaim.

In Appellant's second subclaim under this issue, he challenges the following excerpt of the Commonwealth's closing argument.

> *Prosecutor:* When Appellant first gets in there, he is strong. They hit him with we got your fingerprints. I don't know how that got there. But you were around there. No, no, I wasn't there, I was somewhere else. Smart, thinking. Finally, when they are going to leave, Aisha [Kinney, Appellant's girlfriend and the mother of his daughter] told [Appellant] something when they said let him talk. What thing

11. Defense counsel's opening argument included the following statements related to Appellant's alleged feelings of remorse.
> The first words that you [the jury] heard from [Appellant] were "guilty" to every charge that the Commonwealth threw at him.... I was struck ... at how routine that seemed....
> The first thing that you need to realize about that apparently routine moment is what it really means for us, for you, each of you as individuals what that means.
> What you saw in that brief moment was someone accepting responsibility for what he has done. He's not here to fight, evade, deny, nothing. He's here to step up and say, Yeah, all those things you just heard, yes, I did it.
> But it means even more than that. It's his way—all he can do is admit—it's his way of expressing his remorse, his sorrow, his regret, for what happened.
> But it's something else. The two charges that he pled guilty to, those first two murders, carried life imprisonment without the possibility of parole, mandatory. No judge, no appeal, no lawyer here, there, everywhere, can do anything about it. He has stepped up and accepted, without a fight, that he will die in prison.
> N.T., 4/21/10, at 70–72 (defense opening argument).
> Let me end where I began, that almost routine moment at the beginning of this trial, he has come to you not after a big fight and denials and phoney [sic] alibis or anything like that. At this point, he stood up to you, in front of you, and said, I accept responsibility for what I have done. I know that means I would die in prison. I know that is likely to be 50 years from now. I accept that penance. I accept that punishment, but I say to you that I would prove to you that he's not so evil, debased, and without worth that he must die.
> *Id.* at 82 (defense opening argument).

did she tell him? Basically, baby, you are on your own, I gave you up, you are on your own, baby, I'm out.

*Defense Counsel:* Objection, Your Honor.

*Court:* Objection sustained. It is the jury's recollection. Objection sustained.

N.T., 5/4/10, at 157 (closing argument) (quoted in Appellant's Brief at 27–28).

Appellant contends that with the above-quoted comment the prosecutor did not merely misstate the evidence, but rather "made it up." Appellant's Brief at 28. Appellant finds nothing in the record to support the prosecutor's comment that Ms. Kinney told Appellant that she "gave [him] up" to the police and he was "on [his] own." *Id.* Rather, Appellant suggests that "the record only reflected that [Ms. Kinney] may have encouraged [Appellant] to do the right thing" and tell the truth. *Id.* at 27–28. Appellant argues that the prosecutor's statement constituted "deliberate misrepresentations," and therefore the trial court abused its discretion in refusing to grant a mistrial. *Id.* at 29.

The Commonwealth argues that, to the extent the prosecutor's characterization of Ms. Kinney's conversation with Appellant may be disputable, the trial court cured any resulting prejudice by immediately sustaining the defense objection and instructing the jurors that their recollection controlled. Commonwealth's Brief at 42–43 (quoting *Commonwealth v. Wesley*, 562 Pa. 7, 753 A.2d 204, 209 (2000), for the proposition that "prompt and effective curative instructions may remove prejudice resulting from improper comments by a prosecutor").

The trial court declined to grant a mistrial, concluding that the prosecutor had not misstated the evidence, but had only paraphrased the totality of Ms. Kinney's testimony. Trial Court Opinion at 10. Although we conclude that the trial court did not abuse its discretion in refusing to grant a mistrial, we also must note that the record does not entirely comport with the trial court's interpretation of the prosecutor's comment for the reasons discussed below.

Ms. Kinney testified for the Commonwealth, strongly implicating Appellant in the murders and disassociating herself from his actions. At trial, Ms. Kinney's testimony established the following: Appellant had a revolver; Appellant told her on the night of the murders that he was going to "meet up" with Ms. Wright to smoke some "wet;" Appellant did not return to Ms. Kinney's home until 8:00 or 9:00 the next morning; after hearing about the murders on the news, Ms. Kinney was afraid to ask Appellant about what had happened to Ms. Wright; days after the murders, Appellant told Ms. Kinney to burn the jacket that he had worn the night of the murders because it had blood on it, but she did not do as he asked because there was "just something wrong" that she did not "want to be involved in;" and Appellant offered to give her $1,000 for some of her expenses, although he did not have a job and he said that he needed a ride to go and pick up his money. N.T., 4/22/10, at 29–45, 49–52. Ms. Kinney also testified that Appellant and Hakeem Bey had gone to school together, testimony that arguably contradicted Appellant's statement to police that he did not know Bey and had never spoken to him. *Id.* at 41; N.T., 4/28/10, at 36. Finally, Ms. Kinney testified that she had visited Appellant only once after he was imprisoned, at which time he told her to take back the incriminating statements she had given to police and say they were lies. N.T., 4/22/10, at 43–44. She refused and did not see Appellant again, explaining as follows:

I just didn't go see him after that. I have kids. Like, I don't, you know, get involved in this. Like, you know, you do what you do, you got to serve your time. Don't try to drag somebody else into it that don't have nothing to do with it. And, like, I really hate him for what he did, like my kids is going through things.

*Id.* at 44.[12]

Thus, the trial court's conclusion that the prosecutor's comments merely paraphrased Ms. Kinney's trial testimony is

12. Immediately after this testimony, defense counsel objected and the court sustained the objection. N.T., 4/22/10, at 44. Neither the basis

consistent with the record of the entirety of her testimony. However, a close reading of the prosecutor's comments in the context of the notes of testimony reveals that the prosecutor was referring **not** to Ms. Kinney's testimony before the court, but rather to what Ms. Kinney had said to Appellant at the police station just before he gave his inculpatory statement to police. What Ms. Kinney said to Appellant at the station was developed at trial **not** by Ms. Kinney's testimony, but by the testimony of two detectives investigating the case, as follows. When Appellant was in custody, the detectives permitted him and Ms. Kinney to speak privately for a few minutes. The words that passed between them are a matter of speculation, except for the end of their conversation, which Detective John Harkins testified that he overheard. Specifically, Detective Harkins testified that Appellant asked Ms. Kinney what she wanted him to do and she told him to tell the truth. N.T., 4/28/10, at 43. Shortly thereafter, Appellant gave his inculpatory statement to the detectives. *See id.;* N.T., 4/23/10, at 119–20.

Thus, the prosecutor's comments concerning specifically what Ms. Kinney told Appellant during this mostly private conversation were not consistent with the testimony presented at trial. However, as discussed above, the trial court sustained defense counsel's immediate objection, and then instructed the jurors that **their** recollection of the evidence was the recollection that mattered. Given the trial court's sustaining of the objection and its immediate instruction to the jury, we cannot conclude that the trial court abused its discretion in refusing to grant a mistrial. Appellant is entitled to no relief.

In Appellant's third subclaim under this issue, he challenges certain statements made by the prosecutor concerning Ms. Wright's fear of testifying against Hakeem Bey, the resulting inability of the Commonwealth to bring Bey to justice promptly for the 2000 murder of Moses Williams, and the failures and funding problems of the state witness relocation program.

for the objection nor the reason for the court's ruling was set forth. The objection is not at issue in this appeal.

Appellant's Brief at 24–27. The background to this claim is as follows.

The following evidence concerning the Commonwealth's prosecution of Hakeem Bey for the murder of Moses Williams, and Ms. Wright's role therein, was presented at Appellant's trial to show the history and circumstances of the case and to establish the aggravating circumstance of killing in retaliation against a witness, 42 Pa.C.S. § 9711(d)(15). Ms. Wright had disappeared prior to Bey's first scheduled trial in April 2004 for Williams's murder because she was too frightened to testify, resulting in the murder charges against Bey being *nolle prossed.* N.T., 4/22/10, at 55–66. Ms. Wright had refused to enter a state witness relocation program because her safety, and that of her family, could not be guaranteed. *Id.* at 61–62. Therefore, the Commonwealth's prosecution of Bey for Williams's murder was delayed for years, and was reinstituted only after Ms. Wright had entered a federal witness protection program in 2007. *Id.* at 63–65. Bey was rearrested for Williams's murder and was scheduled to be tried in March 2008, approximately two months after Appellant murdered Ms. Wright and Ms. Green.[13] *Id.* at 66.

In the prosecutor's closing argument, he mentioned some of this history of the Bey prosecution and Ms. Wright's role in it, as follows.

*Prosecutor:* You heard Ms. Cahill, Ms. Armstrong,[14] getting paid by us for their expertise. Whatever they bill, we pay. But my office doesn't have enough money to hide a girl properly to keep her alive. And when she says, I can't, I am not going in your protective program because I am not safe in it, and you know it, I knew it, and he knew it, and at which point you make a hard call and say, I can't bring this case, I cannot bring justice—

13. After the Wright and Green murders, Bey was brought to trial for the murder of Moses Williams, convicted, and sentenced to life in prison. N.T., 4/22/10, at 68.

14. Ms. Cahill and Ms. Armstrong are, respectively a mitigation specialist and a neuropsychologist who testified on behalf of Appellant at trial. *See* N.T., 5/3/10, at 9–108; N.T., 5/4/10, at 10–78.

*Defense Counsel:* Judge, I object to this.

\* \* \* \* \* \*

*Court:* Yes. Move on. Objection sustained.

*Prosecutor:* We could not bring the case forward. A decision made. It is not legal, it is a moral thing. I will not jeopardize this witness. I cannot assure that she will see another day.

N.T., 5/4/10, at 146–47 (closing argument) (footnote added) (quoted in Appellant's Brief at 24–25, 27).

Appellant claims that the above comments amounted to a suggestion to the jury that he should be sentenced to death to "right the wrong of a failed criminal justice system . . . so that society could receive justice in the end." Appellant's Brief at 25. The Commonwealth asserts that the prosecutor was merely commenting on evidence presented at trial concerning Ms. Wright's identification of Hakeem Bey as the killer of Moses Williams. Commonwealth's Brief at 41. The trial court acknowledged that the prosecutor's statement about the inadequacies of the state witness protection program and its failure to protect the victim was "poorly phrased;" however, the trial court concluded that the statement was not overtly prejudicial and could not have prevented the jury from rendering a fair verdict. Trial Court Opinion at 10 (holding that the challenged comment "was not so prejudicial as to require a mistrial").[15]

We conclude that the trial court did not abuse its discretion in refusing to grant a mistrial. Although the prosecutor's comments contrasting the payment of defense expert witnesses with the inadequate funding of the state witness relocation program were problematic and not relevant, the trial court sustained the defense objection to the remarks and directed the prosecutor to move on. There was no abuse of discretion in the trial court's determination that the challenged

15. We note that there was no evidence linking Appellant to Ms. Wright's fear of testifying against Bey, her decision not to enter a state witness relocation program, or the delay in bringing Bey to justice for the murder of Williams.

remarks were not so prejudicial as to require the extreme remedy of a mistrial.

 In Appellant's fourth and final claim of prosecutorial misconduct, he challenges the following comments concerning the life sentence imposed on Hakeem Bey for the murder of Moses Williams.

*Prosecutor:* You are going to hear Hakeem got life. Yeah. When she was dead, we made a decision, now I am that DA, we are going to go to trial. And, man, it is going to be a bumpy ride. But you know what? Let's go. Because, you know what? You silenced her, but we are going forward. And the jury sat there and said, you know what? You killed Moses. You killed him beyond a reasonable doubt. And they gave him life. That's right. And the jury didn't have before you what you have, three aggravators. The only aggravator they had was endangerment of others, that somebody got placed in danger because he fired the shot. Remember bullets travel? And nobody got hurt. And they don't know everything that happened, so that was the only aggravator.

*Defense Counsel:* Objection.

*Court:* Sustained. Not relevant to this case. Move on, [ ].

*Prosecutor:* Malik Bennett. Tough decision. You know what? We are not a hundred percent, but we are going forward. Bang, he got convicted on his murder, serving life.

N.T., 5/4/10, at 164–65 (closing argument) (quoted in Appellant's Brief at 29).

The specific grounds upon which the defense objected to the prosecutor's comments were not elucidated; however, the notes of testimony make clear that the trial court sustained the objection on the basis of relevance. Here, Appellant's argument is brief, but is focused on his assertion that the life sentence imposed on Hakeem Bey for the murder of Moses Williams was not relevant to the jury's deliberations regarding Appellant's sentence for the murders of Ms. Wright and Ms. Green. Appellant's Brief at 29 ("Whether Bey received life or death had no Rule 401 relevant effect on what should have

transpired during the jury's deliberations in this case."). The Commonwealth points out that the **defense,** during re-cross-examination of one of the investigating detectives, elicited testimony that Hakeem Bey and Malik Bennett were each serving a life sentence for another murder. Commonwealth's Brief at 44–45 (citing N.T., 4/28/10, at 45–46). In the Commonwealth's view, the prosecutor's comments in closing argument were proper because he was anticipating a defense argument that because Bey had received a life sentence, so should Appellant. *Id.*

In its opinion, the trial court agreed with the Commonwealth that the prosecutor was merely anticipating a defense argument when he argued that the jury should not be swayed by the fact that Hakeem Bey had received a life sentence for the murder of Moses Williams. Trial Court Opinion at 10–11. Accordingly, because "[t]here was nothing improper in [the prosecutor's] argument," the trial court held that Appellant's motion for a mistrial was properly denied. *Id.* at 11.

The trial court did not abuse its discretion in denying Appellant's motion for a mistrial. Our review of the certified record reveals that the entire matter of whether and how Bey's life sentence could be mentioned in the defense closing argument was raised at an in-chambers conference the same day as closing arguments, as follows.

*Prosecutor:* I don't want [defense counsel] discussing Malik Bennett's murders, what their sentence was that they got.

*Defense Counsel:* Malik Bennett?

*Prosecutor:* Malik Bennett and Hakeem Bey, that they received life.

*Defense Counsel:* It came in without objection.

\* \* \* \* \* \*

*Court:* I think it is in evidence.

\* \* \* \* \* \*

*Prosecutor:* ... it is in because it is the procedural history of those cases. But [Bey and Bennett] weren't charged with this crime. I think the point is, they shouldn't be able

to argue something along the lines of those other guys were involved and they didn't get death, so neither should he.

*Court:* I don't think that's what they are going to argue.

*Defense Counsel:* **I will certainly mention the fact that Bey is doing life.** I am not going to say—make the comparative justice argument.

*Court:* So long as you don't do that, he can make reference to the life sentence.

*Prosecutor:* Should he, then it will be limited to a three-minute surrebuttal then since he violated what he has just said.

*Court:* You can object and I will instruct the jury if that occurs, if [defense counsel] goes beyond that.

*Defense Counsel:* **I will say Hakeem Bey is doing life.**

N.T., 5/4/10, at 8–10 (in-chambers conference) (emphasis added).

■ Thus, based on defense counsel's own words, it is clear that the prosecutor could have reasonably anticipated that defense counsel would mention Bey's life sentence in his closing argument. As the trial court recognized, a prosecutor, as well as defense counsel, may reasonably anticipate arguments of his or her opponent and respond accordingly. *See* Trial Court Opinion at 10; *Hutchinson,* 25 A.3d at 307 ("[T]he prosecution must be permitted to respond to defense counsel's arguments."); *Commonwealth v. Marrero,* 546 Pa. 596, 687 A.2d 1102, 1109 (1996) (concluding that a prosecutor's comments during closing argument concerning the possibility of commutation were "a fair response to defense counsel's anticipated argument that a life sentence meant that [the] appellant would spend his entire life in prison").[16] The trial court did not abuse its discretion in refusing to grant a mistrial.

■ Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), we must review a sentence of death and affirm, unless we determine that

16. *Marrero* was an Opinion Announcing the Judgment of the Court, but all four justices deciding the case joined this portion of the Opinion.

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d).

42 Pa.C.S. § 9711(h)(3).

Following our thorough review of the facts and the record, we conclude that the sentence of death was not the result of "passion, prejudice, or any other arbitrary factor," but rather was based on the Commonwealth's evidence admitted at trial. *Id.* In addition, we conclude that the evidence admitted at trial was sufficient "to support the finding of at least one aggravating circumstance." *Id.* Indeed, the evidence was sufficient to support the finding of all three aggravating circumstances. With regard to 42 Pa.C.S. § 9711(d)(11), convicted of another murder, Appellant pled guilty to the first-degree murder of **both** Ms. Wright and Ms. Green. With regard to 42 Pa.C.S. § 9711(d)(15), killing in retaliation against a witness, the evidence was sufficient to establish that Ms. Wright was a witness for the Commonwealth against Hakeem Bey and that Appellant murdered her at the behest of Bey to prevent her from testifying. With regard to 42 Pa.C.S. § 9711(d)(2), paid by another person for the killing of the victim, the testimony of several witnesses established that Appellant was going to be paid for murdering Ms. Wright.

The verdict and sentence of death are hereby affirmed.[17]

Former Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE, Justice EAKIN and BAER and Justice TODD join the opinion.

Justice SAYLOR files a concurring opinion.

---

**17.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).

## CONCURRING OPINION

Justice SAYLOR.

I join the passages of the majority opinion captioned, "Suppression of Appellant's Statement to Police" and "Photographs of the Victim's Children," and concur in the result relative to the balance.

With regard to sufficiency review in a plea case, I support the majority's approach of focusing primarily on the plea colloquy, albeit, conceptually, I would prefer to consider the mandatory review as merely "plea review" in a plea case, reserving the mandatory "sufficiency review" for cases in which there is a guilt-phase evidentiary record. *Accord Commonwealth v. Frey*, 588 Pa. 326, 341, 904 A.2d 866, 875 (2006) (Saylor, J., concurring).[1]

1. In my concurrence in *Frey*, I explained:

 I believe that a logical corollary of the Court's decision to approve the acceptance of pleas of guilt to first-degree murder is the understanding that it simply may not always be possible to conduct traditional sufficiency review relative to the underlying conviction in pleas cases. Accordingly, in such cases it should be appropriate to center the obligatory review on the factual basis for the plea as developed during the course of the plea colloquy, in line with the general approach for reviewing pleas to other offenses, *see generally Commonwealth v. Hines*, 496 Pa. 555, 437 A.2d 1180 (1981). Traditional sufficiency review should apply, however, concerning aggravating circumstances developed on the record at the penalty hearing.

 