J-S07007-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL MOORE | : | |
| | : | |
| Appellant | : | No. 3076 EDA 2018 |

Appeal from the Judgment of Sentence Entered June 29, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008499-2011

BEFORE:   NICHOLS, J., KING, J., and STRASSBURGER, J.[*]

MEMORANDUM BY NICHOLS, J.:                                Filed: May 8, 2020

Appellant Michael Moore appeals from the judgment of sentence imposed following his bench trial convictions for first-degree murder, conspiracy, and related offenses.  Appellant challenges the denial of his motion to suppress, the admissibility of his proffer statement, the weight of the evidence supporting his first-degree murder conviction, and the legality of his sentence.  Appellant also requests that we remand the matter for an evidentiary hearing based on after-discovered evidence.  We affirm Appellant's convictions and deny Appellant's motion for remand.  We vacate Appellant's judgment of sentence and remand the matter solely for correction of the sentencing order.

By way of background, Appellant was charged with murder and related offenses after he shot and killed Shawn Outlaw (the decedent) on June 24,

_____
[*] Retired Senior Judge assigned to the Superior Court.

2010.  At the time of the shooting, Appellant was thirteen years old.  The trial

court explained that on the night of the shooting, Appellant's cousins,

> Lionell Walker and Stephen Massenberg[, drove Appellant] to 2124 Estaugh Street [in] Philadelphia. . . .  In retaliation for a 2008 shooting resulting in Walker's partial paralysis, [Appellant] lured [the decedent] around the corner and shot [him] four times. [The decedent] was pronounced [dead at] the scene.
>
> [Prior to the shooting, Appellant] spent nearly fifteen to twenty minutes loitering around Estaugh Street before walking up to the [decedent's] home.  Lathan Barfield and Kareem Williams, both nephews of the decedent, testified that shortly after midnight on June 24, 2010, [Appellant] approached them while they were sitting outside on the front porch and asked if the "boy with the red hat" was home, indicating [the decedent] and his Phillies hat. Barfield testified that he believed [Appellant] was there to buy marijuana from his uncle.  Williams went inside the home to retrieve [the decedent].  When [the decedent] came outside the house, he followed [Appellant] around the corner of Estaugh Street.  Barfield began to follow his uncle[,] but [the decedent instructed him] to hang back and wait. . . . Within a matter of minutes, Barfield heard several gun shots and ran around the corner to find his uncle[, the decedent,] falling to the ground while thirteen-year-old [Appellant] fled down the street, gun in hand. Shortly after emergency personnel arrived on the scene, Barfield and Williams were taken to the Philadelphia Police Department's Homicide Unit where they were questioned about the incident, shown a photo array, and subsequently identified [Appellant] as the shooter.
>
> The testimony of Detective [Thomas] Gaul of the Philadelphia Police Department established that on March 2, 2011, pursuant to an arrest warrant, [Appellant] was transported to the Homicide Unit from a juvenile placement, where he was being held in connection with an unrelated matter.  Prior to beginning questioning, Detective Gaul obtained the consent of [Appellant]'s legal guardian, his aunt, Ms. Toka Johnson.  Detective Gaul's testimony further established that [Appellant] was sufficiently informed, by both himself as well as Detective Verrecchio, of the charges against him as well as his constitutionally protected

*Miranda*[1] rights. According to the testimony presented at trial, [Appellant] fully understood his situation. Before beginning questioning, Detectives Gaul and Verrechio read and explained the entirety of the ***Miranda*** warnings and obtained [Appellant]'s signature as a confirmation that he was willing to waive his rights. Not only did [Appellant] verify his understanding of his rights at the start of the interview, but also, Detective Gaul repeatedly reaffirmed [Appellant]'s waiver throughout the interview. During this interview, [Appellant] readily confessed to having shot [the decedent] and having done so on behalf of his two older cousins, Walker and Massenberg.

At some point during this interview, [Appellant] asked Detective Gaul whether or not he would be able to work out a deal if he agreed to testify against his cousins. Detective Gaul explained that he did not have the authority to make such an [arrangement] and that such a deal could only be accomplished through a District Attorney and his own attorney. At that point, [Appellant] declined to continue the interview and invoked his right to remain silent until he could have the opportunity to speak with a lawyer. It was then that the interview ceased.

Trial Ct. Op., 7/17/19, at 3-5 (record citations omitted).

On July 26, 2011, the Commonwealth filed a criminal information charging Appellant with first-degree murder, possessing an instrument of crime (PIC), firearms not to be carried without a license, possession of a firearm by a minor, and carrying firearms in public.[2]

On December 14, 2012, Appellant, who was represented by counsel, agreed to participate in a proffer session.[3] During the interview, Appellant

---

[1] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

[2] 18 Pa.C.S. §§ 2502(a), 907(a), 6106(a)(1), 6110.1(c), and 6108, respectively.

[3] In addition to Appellant and Appellant's counsel, Detective John Verrecchio, Detective Gaul, and an assistant district attorney were present at the proffer session.

- 3 -

stated that Massenberg gave him a gun and instructed him to shoot the decedent in the head. *See* N.T. Trial, 11/29/16, at 81. Appellant explained that Massenberg told him "if things go wrong and [Appellant gets] caught up in it," then Appellant would "just go to placement at [j]uvenile." *Id.* Appellant also stated that, after the shooting, Massenberg and Walker warned him that he "better not say anything or tell what happened." *Id.*

On April 24, 2015, while plea negotiations were ongoing, Appellant filed a motion to suppress his 2011 statement to homicide detectives. The trial court conducted suppression hearings on April 24, 2015 and May 4, 2015. Appellant argued that there was "nothing on the record to establish that he knowingly, intelligently and voluntarily waived his [*Miranda*] right[s]," and that, due to his age, he was "incapable of doing so." N.T. Suppression Hr'g, 5/4/15, at 9. Further, Appellant argued that at the time of the statement, he "didn't really understand what was going on." *Id.*

At the suppression hearing, the Commonwealth presented testimony from Detective Gaul, which the trial court summarized as follows:

> Detective Gaul testified that [Appellant] was arrested on a warrant for this homicide on March 2, 2011. At the time of his arrest, [Appellant] was already in custody in western Pennsylvania for an unrelated shooting. Furthermore, it should be noted that at the time of his arrest, [Appellant] had a previous arrest for a third shooting. On the day Appellant was served with the warrant, he was scheduled to appear in Philadelphia Juvenile Court on a separate matter.
>
> Sometime after 8:00 a.m. [on March 2, 2011, Appellant] was picked up at juvenile court in Philadelphia and transported to the Homicide Division of the Philadelphia Police Department.

- 4 -

[Appellant] was not placed in handcuffs when he was in homicide, but placed in an interview room. Detective Gaul met with [Appellant] around 11:00 a.m., advised [Appellant] of the charges against him and the procedure to be followed, explained to Appellant his *Miranda* rights including that he was under arrest for the murder of [the decedent], that anything he said could be used against him in a court of law, that if he couldn't afford an attorney one would be provided to him and that he could stop the interview any time he desired.

[Appellant] signed the waiver of his rights. [Appellant] completed, initialed, and signed the first page of a form acknowledging that he was waiving his *Miranda* rights. The form was introduced during the motion to suppress, identifying the murder of [the decedent] as the subject of the interview. Detective Gaul further advised [Appellant] that because of his age[,] the detective needed the permission of a parent or legal guardian. [Appellant] told the detective that his mother had passed, that his legal guardian was Toka Johnson, and [provided] a telephone number for the guardian. [Detective] Gaul phoned Ms. Johnson, advised her that [Appellant] was under arrest for the murder of [the decedent] and that the detective wanted to take a statement from [Appellant]. The detective advised [Appellant]'s guardian of the *Miranda* warnings that had been provided to [Appellant,] including that any statement taken from the juvenile would be used against him in court. Ms. Johnson gave her permission to interview [Appellant].

Detective Gaul testified that [Appellant] was not physically abused or threatened in any way, was not injured or appear to be under the influence of any drugs or alcohol, that he was given opportunity to use the bathroom and provided water and snacks and that he appeared to understand and comprehend all that was going on. During the interview, [Appellant] stated the whole story of what had happened. They then proceeded to the form in order to document [Appellant's] statement to written form. It was at that time when [Appellant] told the detectives he still wanted to continue cooperating, but wanted an attorney present as the detective could not promise him how much time he would be doing as a result of his involvement in the murder. [Appellant] told the detectives that he knew how the system worked and that he didn't want his statement to be passed to the other people who will be arrested. For the same reason[, Appellant] picked out the pictures

of his cousins but would not sign the photographs.  The interview was then concluded. . . .

Trial Ct. Op. at 8-10 (citations omitted and some formatting altered).  On May 4, 2015, the trial court denied Appellant's suppression motion.

On May 18, 2015, Appellant signed a written plea agreement with the Commonwealth.  Therein, Appellant agreed to plead guilty to third-degree murder, conspiracy, possession of a firearm by a minor, carrying firearms in public, and PIC in exchange for a sentence of nineteen to forty years' incarceration.  Under the terms of the agreement, Appellant was also required to testify against his cousins.  The agreement stated that if Appellant failed to comply with the terms of the deal, then the Commonwealth would use Appellant's December 14, 2012 proffer statement at trial in its case-in-chief.[4]

Ultimately, Appellant breached the terms of the agreement by refusing to testify against his cousins.  On November 28, 2016, Appellant withdrew his guilty plea, and the matter proceeded to a bench trial.[5]  ***See*** N.T. Trial, 11/28/16, at 10.

_____

[4] The Commonwealth read the terms of the agreement into the record at trial. ***See*** N.T. Trial, 11/29/16, at 69.  The agreement was also marked and moved into evidence as Commonwealth's Exhibit 78.  ***See id.***  Although the agreement is not included in the certified record, the Commonwealth attached a copy of the agreement to its brief.

[5] The trial court's "Trial Disposition and Dismissal Form" included the charges for third-degree murder and criminal conspiracy, which were part of Appellant's guilty plea.  ***See*** Trial Disposition and Dismissal Form, 11/28/16, at 1.

At trial, Detective Gaul testified regarding Appellant's 2011 statement to homicide detectives. **See** N.T. Trial, 11/29/16, at 64. Over Appellant's objection,[6] the Commonwealth also elicited testimony from Detective Gaul regarding Appellant's statement at the 2012 proffer session. **Id.** at 68.

Appellant also testified at trial. Consistent with his earlier statements, Appellant testified that Massenberg instructed him to shoot the decedent in the head. N.T. Trial, 11/29/16, at 118, 132. However, Appellant added that before the shooting, Massenberg "made it clear" that he would kill Appellant if he did not comply with Massenberg's instructions. **Id.** at 117-18, 136. Appellant stated that he looked up to his older cousins, but they "took advantage" of him. **Id.** at 125. Further, although Appellant acknowledged that he shot the decedent in the head, he stated that "at the time, I don't know what I was thinking. I wasn't thinking at all probably. I didn't intend to do that. I don't know what happened or where that came from." **Id.**

Appellant also introduced into evidence a letter that Massenberg sent to both parties and the trial court. **Id.** at 138-39; Appellant's Trial Ex. 1. In the letter, dated July 24, 2014, Massenberg stated that he used a .38-caliber revolver to murder the decedent in retaliation for a 2008 shooting. **See** Appellant's Trial Ex. 1 at 1. Massenberg indicated that although he used Appellant "to lure the deceased out," Appellant "did not know of

_____

[6] In response to Appellant's objection, the Commonwealth presented the agreement that Appellant signed in 2015, which stated that the Commonwealth would use Appellant's proffer statement during its case-in-chief if Appellant failed to cooperate. N.T. Trial, 11/29/16, at 69; Commonwealth's Ex. 78.

[Massenberg's] intent to kill." *Id.* Massenberg also stated that he provided Appellant with a gun. *Id.* at 2. He explained that he "took advantage" of Appellant, who was "orphaned" and "less fortunate." *Id.* at 2-3.

On November 29, 2016, the trial court found Appellant guilty of all charges. N.T. Trial, 11/29/16, at 158. On June 29, 2017, the trial court sentenced Appellant to twenty-five years to life in prison for first-degree murder and a concurrent term of five to ten years' imprisonment for conspiracy.[7] N.T. Sentencing Hr'g, 6/29/17, at 58-59. The trial court also ordered Appellant to serve consecutive terms of seven years' probation for carrying a firearm without a license, seven years' probation for possession of a firearm without a license, and five years' probation for carrying firearms on public streets. *Id.*

On July 14, 2017, Appellant filed an untimely post-sentence motion challenging, among other things, the weight of the evidence supporting his first-degree murder conviction. On July 18, 2017, the trial court accepted Appellant's post-sentence motion as timely filed and reinstated Appellant's direct appeal rights *nunc pro tunc*. Appellant's counsel did not file a direct appeal. Appellant subsequently filed a *pro se* petition under the Post

---

[7] Although the trial court sentenced Appellant to a concurrent term of five-to-ten years' imprisonment for conspiracy, the docket reflected a five-to-ten-year-sentence for third-degree murder. *See* Docket No. 8499-2011 at 7. The trial court docket also references a June 29, 2017 sentencing order, but there is no independent sentencing order in the certified record. *Id.* However, the record does contain a "Court Commitment" sheet which includes a five-to-ten year sentence for third-degree murder and appears to have been signed by the sentencing judge. *See* Ct. Commitment Form, 6/29/17, at 1.

Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, seeking reinstatement of his direct appeal rights. On October 18, 2017, the trial court reinstated Appellant's direct appeal rights *nunc pro tunc*.

On October 18, 2018, Appellant filed a timely notice of appeal. Appellant subsequently filed a timely court-ordered Pa.R.A.P. 1925(b) statement. In its Rule 1925(a) opinion, the trial court explained that the sentencing order incorrectly reflected a sentence for third-degree murder, rather than for conspiracy. *See* Trial Ct. Op. at 14. The trial court indicated that this was "a patent and obvious mistake" and requested that we remand the matter for correction. *Id.* at 15.

On August 5, 2019, Appellant filed a motion to remand the matter for an evidentiary hearing based on after-discovered evidence. *See* Mot. for Remand, 8/5/19, at 1. Therein, Appellant indicated that counsel received a copy of a PCRA petition that was filed by his cousin, Massenberg. *Id.* In that PCRA petition, Massenberg stated that he killed the decedent and that Appellant was innocent. *Id.* On August 27, 2019, this Court issued an order deferring Appellant's motion to this panel for disposition.

Appellant raises the following issues on appeal:

1. Should Appellant's confession have been suppressed because it could not have been voluntary given that, *inter alia*, Appellant was [fourteen years old] at the time of the confession and he did not have a guardian or an attorney present?

2. Did the trial court err in admitting Appellant's off-the-record proffer statement to the District Attorney of Philadelphia in the Commonwealth's case in chief and not as rebuttal to any denial

on the part of Appellant and, therefore, a new trial should be ordered?

3. Is Appellant's first-degree murder conviction [] against the weight of the evidence and should a new trial should be ordered given that Appellant was [thirteen years old] at the time of the shooting and was under duress because he was driven to the scene by two uncles, these two uncles gave Appellant a gun, and instructed Appellant to shoot [the d]ecedent?

4. Should Appellant's judgment of sentence be vacated because Appellant's sentence is illegal per the sentencing order of June 29, 2017 and docket and in violation of double jeopardy in that Appellant is sentenced for both first and third-degree murder when there was one decedent and, therefore, the sentence of [five to ten] years for third-degree murder should be vacated?

Appellant's Brief at 4.

In his first claim, Appellant argues that the trial court should have suppressed his 2011 statement to homicide detectives. *Id.* at 10. In support, Appellant notes that he was fourteen years old when he gave the statement. *Id.* He also asserts there was no legal guardian or attorney present and that he "had expectations of being released at the age of [twenty-one] on what was a first-degree murder case with little possibility of decertification." *Id.* Further, he argues that he "had little conception of the seriousness of the case and his cooperation with authorities," and that "[t]here is no way that a [fourteen-]year-old could properly evaluate the implications of the exploitative interaction with experienced homicide detectives." *Id.* at 12. He concludes that "[g]iven Appellant's age and expectations as well as the totality of the circumstances, Appellant's confession cannot be deemed voluntary and should have been suppressed." *Id.* at 10.

The Commonwealth responds that "in view of the totality of the circumstances, the confession was knowing, voluntary, and intelligent." Commonwealth's Brief at 13. In support, the Commonwealth explains that Appellant had "prior contact with the criminal justice system . . . [which] was relevant to determining the voluntariness of his waiver of **Miranda** rights." **Id.** at 13-14. Further, the Commonwealth states that "before taking his confession[,] the police contacted [Appellant's] legal guardian, explained to her that [Appellant] was under arrest for the murder of [the decedent] and that he had been given his **Miranda** warnings, and obtained her consent." **Id.** Under these circumstances, the Commonwealth argues that "the [trial] court did not abuse its discretion in denying [Appellant's] suppression motion." **Id.** at 13-14.

We apply the following standard when reviewing the denial of a suppression motion:

> [O]ur initial task is to determine whether the [trial court's] factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous.

**Commonwealth v. Bryant**, 67 A.3d 716, 724 (Pa. 2013) (citation omitted).

The validity of a waiver of **Miranda** rights is a question of law. **Commonwealth v. Knox**, 50 A.3d 732, 746 (Pa. Super. 2012) (citations omitted).

- 11 -

The inquiry has two distinct dimensions. First[,] the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

A determination of whether a juvenile knowingly waived his *Miranda* rights and made a voluntary confession is to be based on a consideration of the totality of the circumstances, including a consideration of the juvenile's age, experience, comprehension and the presence or absence of an interested adult.

*In re B.T.*, 82 A.3d 431, 436 (Pa. Super. 2013) (quoting *In re T.B.*, 11 A.3d 500, 505-06 (Pa. Super. 2010)) (some formatting altered).

In examining the totality of circumstances, we also consider: (1) the duration and means of an interrogation; (2) the defendant's physical and psychological state; (3) the conditions attendant to the detention; (4) the attitude of the interrogator; and (5) "any and all other factors that could drain a person's ability to withstand suggestion and coercion."

*T.B.*, 11 A.3d at 506 (citation omitted).

However, we have reiterated that "the presence of an interested adult is . . . no longer a *per se* requirement during a police interview of a juvenile. The presence of an interested adult, however, is a factor in determining the voluntariness of a juvenile's waiver of *Miranda* rights." *Interest of N.M.*, 222 A.3d 759, 772 (Pa. Super. 2019) (citations omitted). "Because the totality of the circumstances varies from case to case, we have both affirmed and reversed orders denying suppression where a juvenile defendant waived *Miranda* without first consulting with an interested adult." *Commonwealth*

***v. Smith***, 210 A.3d 1050, 1059 (Pa. Super. 2019) (citations omitted), *appeal denied*, 218 A.3d 1199 (Pa. 2019).

Here, the trial court addressed Appellant's claim as follows:

This court found the testimony of Detective Gaul to be credible, [in] that [Appellant]'s guardian[, Ms. Johnson,] gave the police a knowing, intelligent and voluntary consent to interview [Appellant], that both juvenile and guardian were aware that [Appellant] was being interviewed concerning the murder of [the decedent] and that [Appellant] was a suspect in that murder. This court further found that [Appellant] and Ms. Johnson understood the ***Miranda*** rights that had been read to them and that [Appellant] intended to make a statement and to cooperate with the police. Furthermore, the questioning was not protracted, [Appellant] was not under the influence of any drugs or alcohol, and not deprived of food, drink or the use of a bathroom. Additionally, [Appellant] was not threatened or otherwise coerced into making the statement. The uncontradicted testimony was that Detective Gaul maintained a calm and cordial demeanor throughout the interview and that [Appellant] understood the rights he was giving up and what was happening.

[Appellant] contends that based on a totality of the circumstances, his confession to the police should have been suppressed as involuntary exclusively because he was fourteen years old at the time and no guardian was present. . . . the law is clear that the determination of whether a juvenile knowingly waived his ***Miranda*** rights and made a voluntary confession [is] based upon a consideration of the totality of the circumstances, including the duration and means of interrogation[,] the defendant's physical and psychological state, the conditions attendant to the detention, the attitude of the investigator, the juvenile's age, experience, comprehension[,] and the presence or absence of an interested adult and any and all other relevant factors. Although [Appellant] was only fourteen at the time of the interview, he had considerable experience with the legal system, with two prior arrests for assault, at the time being housed in a juvenile facility[,] and on the day he was brought to police headquarters[,] he had been at the juvenile court for an unrelated shooting case.

[Appellant] was not subject to physical or psychological abuse and he was informed of his rights as was his guardian who consented to the interview. Appellant signed the *Miranda* waiver and only invoked his right to stop the interview when presented with a written statement, at which time the interview was stopped. Although the law no longer requires the presence of an interested adult, it is a factor in determining the voluntariness of the waiver. Under the circumstances, as this juvenile[, (Appellant), ] was quite familiar with the justice system, with at least two prior arrests, as well as a commitment to juvenile placement, both he and his guardian having been properly informed of the *Miranda* rights, the short duration of the interview, the lack of any physical or psychological abuse, the totality of the circumstances require a finding that the waiver was knowing, intelligent and voluntary.

Trial Ct. Op. at 10-11 (citations omitted).

Based on our review of the record, we discern no factual or legal error in the trial court's analysis of Appellant's claim. *See Bryant*, 67 A.3d at 724. The trial court credited Detective Gaul's testimony that he did not threaten, intimidate, or coerce Appellant into making a statement. *See In re B.T.*, 82 A.3d at 436. Further, although Appellant was fourteen at the time of the interview, the trial court found that Appellant understood his rights and the consequences of making a statement to police. *See id.* As noted by the trial court, Appellant was familiar with the juvenile system and was also in custody for an unrelated shooting case. *See* Trial Ct. Op. at 11. Finally, the trial court considered the short duration of the detention, Appellant's physical and psychological state, and Detective Gaul's calm demeanor throughout the interview. *See T.B.*, 11 A.3d at 506. Therefore, in light of the totality of these circumstances, we agree that Appellant's waiver of his *Miranda* rights was knowing, voluntary, and intelligent. *See B.T.*, 82 A.3d at 431; *see also*

- 14 -

***Knox***, 50 A.3d at 746.  Accordingly, the trial court properly denied Appellant's motion to suppress his statement.  ***See Bryant***, 67 A.3d at 724.

In his second claim, Appellant argues that the trial court erred by allowing the Commonwealth to use Appellant's off-the-record proffer statement during its case-in-chief.  Appellant's Brief at 13.  Appellant contends that his proffer statement was inadmissible under Pa.R.E. 410.  ***Id.***  Further, he asserts that because the trial court admitted the proffer statement before Appellant testified at trial, it was not harmless error.  ***Id.*** at 14.

The Commonwealth responds that "[t]he admissibility of [Appellant's] statement is governed by an agreement, which [Appellant] signed in the presence of his attorney, and in which he agreed that the statement could be used in court under certain circumstances, which were met here." Commonwealth's Brief at 14.   Therefore, the Commonwealth contends that Appellant's statement was properly admitted at trial.  ***Id.***

"The admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion."  ***Commonwealth v. Treiber***, 874 A.2d 26, 31 (Pa. 2005) (citation omitted).

Rule 410 of the Pennsylvania Rules of Evidence provides, in relevant part, as follows:

> **(a) Prohibited Uses.** In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions:
>
> \*     \*     \*

(4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later withdrawn guilty plea.

Pa.R.E. 410(a)(4).

Ordinarily, any statement made by the defendant during plea negotiations is inadmissible at trial during the Commonwealth's case-in-chief. ***Commonwealth v. Widmer***, 120 A.3d 1023, 1026 (Pa. Super. 2015). However, we have recognized that during the plea-bargaining process, "a defendant is permitted to waive valuable rights in exchange for important concessions by the Commonwealth when the defendant is facing a slim possibility of acquittal." ***Commonwealth v. Byrne***, 833 A.2d 729, 736 (Pa. Super. 2003) (citation omitted). Therefore, a defendant may waive his right to assert that a statement is inadmissible under Rule 410, so long as that waiver is knowing, voluntary, and intelligent. ***Widmer***, 120 A.3d at 1027 (citing ***Byrne***, 833 A.2d at 736).

In ***Widmer***, the defendant agreed to participate in a proffer with the Commonwealth. ***Widmer***, 120 A.3d at 1027. Before the defendant provided a statement, the Commonwealth indicated that if the defendant later withdrew his plea, then the Commonwealth would use the defendant's proffer statement against him at trial. ***Id.*** The defendant signed an agreement in which he expressly agreed to those terms. ***Id.*** at 1024-25. Ultimately, the defendant withdrew his plea and the trial court allowed the Commonwealth to use the defendant's proffer statement at trial during its case-in-chief. ***Id.*** at 1025.

On appeal, the **Widmer** Court held that the defendant's waiver of his Rule 410 rights was valid, as the Commonwealth unequivocally indicated that the defendant's statements would be used at trial if he withdrew his plea. ***Id.*** at 1028. Further, we noted that the defendant's chances of acquittal were relatively slim. ***Id.*** Under those circumstances, we concluded that the defendant properly waived his Rule 410 rights during the plea-bargaining process and that "the trial court did not err in admitting into evidence the statements [the defendant] made during plea negotiations with the Commonwealth." ***Id.***

Here, as in **Widmer**, the Commonwealth conditioned its plea offer on Appellant's waiver of his Rule 410 rights. ***See Widmer***, 120 A.3d at 1027. As noted by the trial court,[8] the Commonwealth specifically stated in the

_____

[8] The agreement provided, in relevant part, as follows:

> [Appellant] agrees that if he participates in any criminal activity after the date of this agreement, or if he lies to the District Attorney or Philadelphia Police Department or any other law enforcement or prosecutorial agency, or if he lies in any testimony about a material matter, or if he stops cooperating under this agreement, or if he violates any other term or condition of this agreement, this agreement is null and void. And [Appellant] will be prosecuted to the fullest extent, including reinstatement of the lead charge of murder of the first degree. And **any and all statements and testimony made under this agreement, including the proffer statement given by [Appellant] to the District Attorney's Office on or about December 14, 2012, which [Appellant] hereby agrees that the District Attorney's office shall be permitted to use that proffer statement in the Commonwealth's case in**

agreement that it would use Appellant's proffer statement at trial if Appellant ultimately failed to comply with the terms of the plea deal. *See* N.T. Trial, 11/29/16, at 69; *see also Widmer*, 120 A.3d at 1027. Both Appellant and his counsel signed the written agreement memorializing those terms. *See* N.T. Trial, 11/29/16, at 69. At the time Appellant signed the agreement, he was facing a slim possibility of acquittal.[9] *See Widmer*, 120 A.3d at 1028; *see also Byrne*, 833 A.2d at 735. Under these circumstances, Appellant's waiver of his Rule 410 rights was knowing, voluntary, and intelligent. *See Widmer*, 120 A.3d at 1027; *see also Byrne*, 833 A.2d at 735. Therefore, we discern no abuse of discretion by the trial court in admitting Appellant's statement. *See Treiber*, 874 A.2d at 31. Accordingly, Appellant is not entitled to relief.

In his third claim, Appellant argues that his first-degree murder "conviction is against the weight of the evidence because Appellant was under

---

**chief.** And any evidence derived directly or indirectly from such statements or testimony can and will be used against him in a court of law. If the District Attorney declares this agreement to be null and void, the District Attorney will not be bound by any obligation under this agreement. [Appellant] understands that the District Attorney alone will determine that materiality.

Trial Ct. Op. at 12 (citing N.T. Trial, 11/29/16, at 69-71).

[9] By the time that Appellant signed the plea agreement, the trial court had already denied Appellant's motion to suppress the statement he gave to homicide detectives. *See* N.T. Suppression Hr'g, 5/4/15, at 19. Moreover, the decedent's nephew had identified Appellant as the person who lured the decedent down an alleyway moments before the shooting. *See* N.T. Preliminary Hr'g, 7/26/11, at 17-29.

significant duress from his adult cousins." Appellant's Brief at 15.  Specifically,

Appellant explains that he was thirteen "at the time of the killing, he was

brought to the scene, instructed what to do, and given the murder weapon."

*Id.*  Appellant asserts that his cousins "had considerable control over" him and

that "[g]iven Appellant's age and the threat and actions of [his] cousins,

Appellant's actions in the present matter were committed under duress.  The

weight of the evidence does not support Appellant's first-degree [m]urder

conviction." *Id.* at 18-19.

The Commonwealth responds that "[t]he trial court did not find

[Appellant's] duress argument credible."  Commonwealth's Brief at 15-16.

Therefore, the Commonwealth asserts that "the trial court acted well within

its discretion when it found the verdict was not against the weight of the

evidence and did not shock one's sense of justice." *Id.* at 17.

When reviewing a challenge to the weight of the evidence, our standard

of review is as follows:

> A claim alleging the verdict was against the weight of the evidence
> is addressed to the discretion of the trial court.  Accordingly, an
> appellate court reviews the exercise of the trial court's discretion;
> it does not answer for itself whether the verdict was against the
> weight of the evidence.  It is well settled that the [fact-finder] is
> free to believe all, part, or none of the evidence and to determine
> the credibility of the witnesses, and a new trial based on a weight
> of the evidence claim is only warranted where the [fact-finder's]
> verdict is so contrary to the evidence that it shocks one's sense of
> justice.  In determining whether this standard has been met,
> appellate review is limited to whether the trial judge's discretion
> was properly exercised, and relief will only be granted where the
> facts and inferences of record disclose a palpable abuse of
> discretion.

***Commonwealth v. Landis***, 89 A.3d 694, 699 (Pa. Super. 2014) (citation omitted).

We have explained that

[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial court is to determine that notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice. A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict; thus the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner.

***Id.*** (citation omitted).

Further, "[b]ecause the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." ***Id.*** (citation omitted). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." ***Id.*** (citation omitted).

Here, the trial court addressed Appellant's weight claim as follows:

[Appellant] testified that he was living with his two cousins, Walker and Massenberg, although he did not know the address, and that on the night of the murder they found [Appellant] in the park, picked him up, drove him to the crime scene, then gave him a gun and told him to shoot [the decedent] in the head or they would kill [Appellant]. [Appellant] ended his direct examination

with the explanation that if he had any place else to live he would not have committed the crime. [Appellant's] testimony was not credible. Despite claiming that he had been living with his two cousins, [Appellant] did not know the address that he was living, what street the house faced, how long he had lived there, when he had been kicked out of his guardian's house, or provide any explanation as to how he could have lived with both of his cousins when they had two separate addresses. While acknowledging that the plan was to "Shoot him in the head," he disputed that the plan was to murder [the decedent], claiming that he did not think about what would happen when he shot [the decedent] in the head during the half hour he was waiting for the decedent to appear. [Appellant] shot [the decedent] a total of four times, twice in the head. Accordingly, the verdict was not contrary to the weight of evidence.

Trial Ct. Op. at 6-7.

Based on our review of the record, we discern no abuse of discretion in the trial court's ruling. *See Landis*, 89 A.3d at 699. The trial court did not find Appellant's testimony credible. Therefore, the trial court appropriately concluded that its verdict was not so contrary to the evidence as to require a new trial. *See id.* Moreover, we decline to reassess the credibility of the witnesses and to reweigh the testimony and evidence presented at trial. *See id.* (emphasizing that the trier of fact is "free to believe all, part or none of the evidence," and "[t]his Court may not [re]weigh the evidence or substitute its judgment [f]or that of the fact finder" (citation omitted)). Accordingly, Appellant is not entitled to relief on his weight claim.

In his fourth issue, Appellant challenges the legality of his sentence. Appellant's Brief at 9. Specifically, Appellant argues that the trial court violated double jeopardy principles by imposing a sentence for both first and

- 21 -

third-degree murder. *Id.* Appellant requests that we remand the matter for resentencing or for the trial court to correct his sentence. *Id.*

The Commonwealth agrees that we should remand the matter to the trial court. Commonwealth's Brief at 9. The Commonwealth contends that the sentencing order contains a clerical error, as "the trial court clearly stated that [Appellant] was to be sentenced [to twenty-five] years to life for first-degree murder, and five-to-ten years for conspiracy." *Id.*

The question of whether a trial court has the "authority to correct an alleged sentencing error poses a pure question of law." ***Commonwealth v. Borrin***, 12 A.3d 466, 471 (Pa. Super. 2011) (*en banc*) (***Borrin I***) (citation omitted), *aff'd*, 80 A.3d 1219 (Pa. 2013) (***Borrin II***). "Accordingly, our scope of review is plenary and our standard of review is *de novo*." *Id.* (citation omitted).

"In Pennsylvania, the text of the sentencing order, and not the statements a trial court makes about a defendant's sentence, is determinative of the court's sentencing intentions and the sentence imposed." ***Borrin II***, 80 A.3d at 1226 (citations omitted). However, we have explained that

> a trial court has the inherent, common-law authority to correct 'clear clerical errors' in its orders. This authority exists even after the [thirty]-day time limitation for the modification of orders expires. We have previously concluded that a 'clear clerical error' exists on the face of the record when a trial court's intentions are clearly and unambiguously declared during the sentencing hearing. When this situation arises, the sentencing order is subject to later correction. Accordingly, an oral sentence which is on the record, written incorrectly by the clerk of courts, and then corrected by the trial judge, is a clerical error.

***Commonwealth v. Thompson***, 106 A.3d 742, 766 (Pa. Super. 2014)

(citations omitted and some formatting altered).

Here, at sentencing, the trial court stated the following:

[Appellant], I have read the Supreme Court decision in [***Commonwealth v. Batts***, 163 A.3d 410 (Pa. 2017),] which came down two days ago. I have considered all the reports that have been provided, including the ones for a request to have this sent back to juvenile court many years ago. I have considered your age, the fact you have changed, circumstances of the crime, your background, and emotional maturity and development, as well as a potential for rehabilitation. And based on my reading of [***Batts***,] the sentence on murder of the first degree is twenty-five years to life; firearm to be carried without a license, seven years' probation[;] possession of a firearm by minor, seven years' probation to run consecutive; carrying firearms on public street, five years' reporting probation, consecutive; possessing instrument of crime, five years reporting probation, consecutive; and conspiracy to murder, five to ten years to run concurrent with the [twenty-five] to life.

So in essence, you got [twenty-five] to life.

N.T. Sentencing Hr'g at 58-59.

In its Rule 1925(a) opinion, the trial court explained:

The order of sentence incorrectly states that [Appellant] was sentenced to five to ten years' incarceration for third degree murder, concurrent to the twenty-five to life sentence for first degree murder. The order should have directed that concurrent sentence for the crime of criminal conspiracy. . . . [Appellant] was convicted of first-degree murder. During the sentencing [hearing], [Appellant] was sentenced for first-degree murder. The entry of a sentence of five to ten years was for the conspiracy charge, not murder of the third degree as clearly stated during the sentencing hearing and reflected in the notes. Thus[,] the sentencing order imposing a concurrent sentence of five to ten years for third degree murder was a patent and obvious mistake and the trial court should be permitted to enter an order correcting

- 23 -

the sentence imposed by removing the third degree murder sentence.

Trial Ct. Op. at 14-15.

As noted previously, the trial court's written sentencing order does not appear in the certified record. Nonetheless, both parties and the trial court agree that Appellant is serving a sentence for third-degree murder,[10] which is inconsistent with the trial court's unambiguous statements at the sentencing hearing. *See Thompson*, 106 A.3d at 766. Under these circumstances, we affirm Appellant's convictions, but vacate the judgment of sentence and remand the matter to the trial court for correction of the order. *Borrin I*, 12 A.3d at 471.

Finally, we address Appellant's application to remand the matter for an evidentiary hearing based on after-discovered evidence. *See* Appl. for Remand, 8/5/19. Therein, Appellant refers to Massenberg's 2019 PCRA petition, in which Massenberg took responsibility for killing the decedent. *Id.* at 2, Ex. 1. Appellant maintains that he did not discover this evidence until counsel received a copy of the petition via email on August 2, 2019. *Id.* at 2. Further, he asserts that the evidence "would demand a different outcome at trial because Massenberg accepts responsibility for the homicide at issue." *Id.* Therefore, Appellant requests an evidentiary hearing for the trial court to determine whether a new trial is necessary. *Id.*

_____

[10] Additionally, both the trial court docket and the Court Commitment form reflect the sentencing error described by the parties and the trial court.

The Commonwealth responds that "[t]he purported after-discovered evidence [Appellant] submitted does not require remand." Commonwealth's Brief at 19. The Commonwealth asserts that "[t]he evidence consists of a statement from [Appellant's] cousin, Stephan Massenberg, in which Massenberg confesses to the murder and states that [Appellant] was not an accomplice. This statement is cumulative of another written statement by Massenberg that [Appellant] entered into evidence at trial." *Id.*

Pennsylvania Rule of Criminal Procedure 720(C) provides that "[a] post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery." Pa.R.Crim.P. 720(C). The comment to Rule 720 states that "after-discovered evidence discovered during the direct appeal process must be raised promptly during the direct appeal process, and should include a request for a remand to the trial judge." Pa.R.Crim.P. 720 cmt.

To establish an after-discovered evidence claim, a petitioner must prove by a preponderance of the evidence, the following:

> (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely. At an evidentiary hearing, an appellant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted.

*Commonwealth v. Rivera*, 939 A.2d 355, 359 (Pa. Super. 2007) (citation omitted).

> [A]s our Supreme Court has explained, to warrant an evidentiary hearing on a claim of after-discovered evidence, the request must, at the very least, "describe the evidence that will be presented at the hearing. Simply relying on conclusory accusations . . . is insufficient to warrant a hearing." ***Commonwealth v. Castro***, [93 A.3d 818, 827 (Pa. 2014)]. "[T]he hearing is for the presentation of evidence, not the potential discovery of evidence. An evidentiary hearing . . . is not meant to function as a fishing expedition for any possible evidence that may support some speculative claim[.]" ***Id.*** at 827-28.

***Commonwealth v. Heaster***, 171 A.3d 268, 273-74 (Pa. Super. 2017) (some formatting altered).

Here, based on our review of the record and Appellant's motion, we discern no basis to remand this matter for an evidentiary hearing. As noted previously, at trial, Appellant introduced a letter from Massenberg in which he took responsibility for murdering the decedent. ***See*** N.T. Trial, 11/29/16, at 138-39; Appellant's Trial Ex. 1. To the extent that the statement in Massenberg's PCRA petition can be considered evidence, Appellant did not raise the claim "promptly" after his discovery. ***See*** Pa.R.Crim.P. 720 cmt. Instead, it is clear that Appellant knew about Massenberg's admission of guilt at trial, and in fact presented that evidence to the trial court as part of his own defense. ***See*** N.T. Trial, 11/29/16, at 138-39; Appellant's Trial Ex. 1. Under these circumstances, we cannot conclude that Appellant discovered this evidence during the direct appeal process, or that he promptly presented the claim upon his discovery. ***See*** Pa.R.Crim.P. 720 cmt. Therefore, Appellant is not entitled to an evidentiary hearing on his claim.

Judgment of sentence vacated. Case remanded for correction of the sentencing order. Appellant's application for remand denied. Jurisdiction relinquished.

Judge King joins the memorandum.

Judge Strassburger files a concurring memorandum in which Judge Nichols joins.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/8/20