J-A24011-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAHQUILL JOHNSON | : | |
| | : | |
| Appellant | : | No. 56 EDA 2021 |

Appeal from the Judgment of Sentence Entered October 2, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0008132-2018

BEFORE:   LAZARUS, J., DUBOW, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED NOVEMBER 9, 2021**

Jahquill Johnson appeals from the judgment of sentence, entered[1] in the Court of Common Pleas of Philadelphia County, following his convictions for third-degree murder,[2] carrying a firearm without a license,[3] carrying firearms

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Although Johnson purports to appeal from the November 13, 2020 order denying the post-sentence motions, Johnson's appeal properly lies from the October 2, 2020 judgment of sentence.  ***See Commonwealth v. Chamberlain***, 658 A.2d 395, 397 (Pa. Super. 1995) (order denying post-sentence motion acts to finalize judgment of sentence; thus, appeal is taken from judgment of sentence, not order denying post-sentence motion).  ***See also Commonwealth v. Shamberger***, 788 A.2d 408, 410 n.2 (Pa. Super. 2001).  Accordingly, we have corrected the caption.

[2] 18 Pa.C.S.A. § 2502.

[3] 18 Pa.C.S.A. § 6106(a).

in public in Philadelphia,[4] and possessing an instrument of crime.[5] After careful consideration, we affirm.

On February 15, 2018, around 7:42 p.m., at the intersection of Rosalie Street and Rising Sun Avenue, Johnson argued with, and later shot, Rahman Cunningham in the neck, which eventually caused Cunningham's death. *See* N.T. Jury Trial, 2/11/20, at 55-56, 60-62.

At trial, Karon Nichols testified that, on the night of the shooting, Nichols was approached by Cunningham on the corner of Rosalie Street and Rising Sun Avenue at the house of his then-girlfriend, Saleema Shabazz. *Id.* at 75-80. While outside, Cunningham stated to Nichols that he had an argument with someone. *Id.* Nichols testified that, as he and Cunningham were talking, they entered Shabazz's house. *Id.* at 79. Nichols told Cunningham to wait outside, but Cunningham entered the residence with a panicked look while two people approached the doorway. *Id.* at 79-80. The two approaching individuals—one of whom was Johnson—argued with Cunningham as Nichols directed them all outside of Shabazz's house to the alleyway. *Id.* at 80-81. Nichols testified that Johnson pulled out a revolver and told Cunningham, "I should have f[*c@]ed you up the last situation." *Id.* at 81, 125-26.

Nichols also testified that, while in the alleyway, Johnson pointed the revolver at Nichols after he tried to defuse the situation, which caused him to

---

[4] 18 Pa.C.S.A. § 6108.

[5] 18 Pa.C.S.A. § 907(a).

back up and retreat. *Id.* at 81. While Nichols was backing up, he saw Johnson take items out of Cunningham's pocket, and "the split second that [Nichols] turn[ed his] back to make the left and completely be out of the alleyway, a gunshot went off." *Id.* at 82. Nichols turned back around and saw Cunningham bleeding, so Nichols called 911. *Id.* at 83. Officer John Taggart of the Philadelphia Police Department, a ballistics expert, later testified that the use of a revolver would be consistent with the fact that the police found no shell casing at the scene of the shooting, despite searching for one. *Id.* at 144-46. Expert testimony from the medical examiner, Lyndsey Emery, M.D., Ph.D., suggested the muzzle of the gun was pressed to Cunningham's skin at the time it was fired, and Cunningham was shot just once. *Id.*, 2/12/20, at 7-36.

Khiana Stewart testified that, on the night of the shooting, she was sitting across from both Shabazz's house and the alleyway when Johnson and an unidentified individual confronted Cunningham. *Id.*, 2/11/20, at 239-49. Stewart remembered Johnson introducing the unidentified individual as his brother, Hyfeese.[6] *Id.* at 267-68. Stewart testified that she saw Nichols walk over to the alleyway and try to calm Johnson and Cunningham. *Id.* at 256-67, 273; *id.*, 2/12/20, at 15. Stewart further testified that Johnson drew a gun shortly before she heard a gunshot while she was turned away. *Id.*, 2/11/20, at 267-68. Stewart later identified Johnson in a photo array as well

---

[6] Because Johnson and his brother, Hyfeese, share the same last name, we will refer to Hyfeese by his first name only.

- 3 -

as at trial in court. *Id.* at 247, 253-54. Stewart told the police that Johnson told Cunningham to "give him everything" he had, took his money, shot him, and walked away yelling, "F[*c@] that [N-word]." *Id.* at 263.

During direct examination, the Commonwealth questioned Stewart based on the discrepancy between her statements to the police—which included what Johnson yelled and descriptions of Johnson mugging Cunningham—and Stewart's trial testimony claiming to have forgotten such details. *Id.* at 256, 263-67. Stewart clarified that the reason for her discrepancies was that the crime occurred "a while ago" so she could not "remember every little thing" and she was under the influence of alcohol both during the shooting and when she made statements to police. *Id.* at 264; *id.*, 2/12/20, at 41-42. Detective Jamal Rodriguez, who conducted Stewart's police interview, testified that she did not seem drunk, and had he known Stewart was drunk, he would not have conducted the interview. *Id.*, 2/13/20, at 6.

The Commonwealth also presented a compilation of video surveillance from multiple cameras at a store on the corner of Rosalie Street and Rising Sun Avenue. *Id.* at 29-71. The Commonwealth argued that the video showed: (1) Hyfeese made a drug sale in Cunningham's presence ten minutes before the murder; (2) Stewart sat across from Shabazz's house and the alleyway at the time of the murder; (3) Johnson and Hyfeese walked to and entered Shabazz's house on Rosalie Street; (4) Johnson, Hyfeese, Nichols, and Cunningham came out of Shabazz's house on Rosalie Street and met in

the alleyway; (5) Nichols attempted to intervene in the argument between Johnson and Cunningham; (6) Nichols retreated; (7) Johnson and Hyfeese knocked Cunningham to the ground and jumped on top of him; (8) the revolver fired; and (9) Johnson fled. *Id.* at 41-76, 183-200, 223-34.

Lieutenant Christopher Bullick[7] of the Narcotics Strike Force, proceeded to the area of the shooting on Rosalie Street around 7:42 p.m., and while driving there, he saw two individuals running full speed, eastbound through the alleyway between Anchor Street and Cheltenham Avenue, just a few blocks from the shooting. *Id.*, 2/12/20, at 66-74. After uniformed officers stopped the two individuals, Lieutenant Bullick identified them as Johnson and Hyfeese. *Id.* at 78-80, 95-96.

At trial, the parties stipulated that Johnson was not licensed to carry a firearm. *Id.*, 2/13/20, at 130.

During trial, Johnson made two motions for mistrial. Johnson first moved for a mistrial after the Commonwealth asked Nichols whether he was relocated for witness protection and implied that Nichols was afraid to testify. *Id.*, 2/11/20, at 140-42. The trial court sustained Johnson's objections to each question but refused to grant a mistrial because "[n]othing came out" as Nichols never answered, and the court offered to give the jury a cautionary instruction instead. *Id.* at 143-46. However, Johnson declined the cautionary instruction because, "that line of questioning is not going further anymore[,]

_____

[7] Lieutenant Bullick had been promoted to captain by the time trial commenced.

and I will put on the record I do not want to highlight or draw any further attention to it." *Id.* at 147.

Outside the presence of the jury, Nichols later testified that individuals observing the trial contacted him through social media and threatened to kill him. Trial Court Opinion, 2/19/21, at 14-15; N.T. Jury Trial, 2/11/20, at 149. Nichols testified that while he was parked along a street in Lawncrest, Nichols noticed someone running up to the side of his car, "as if they [were] about to do something." *Id.* at 150. Nichols later received a message from one of Johnson's relatives, which stated, "the boy said he [had] seen you parked at the corner store[,] and he was trying to run up to you to talk about the situation but you sped off." *Id.* The court then removed the individuals threatening Nichols from observing the trial. *Id.*

Regarding Johnson's second motion for mistrial, Juror Number Three informed the court that the night before the jury was to be instructed on the law and given the case for deliberation, Juror Number Three was approached by an unknown relative of Johnson who greeted him on a bus and said, "I know we are not supposed to talk about the trial." *Id.*, 2/14/20, at 3-5. The unknown relative continued saying, "yeah, that is my little brother[,]" but Juror Number Three remained silent and the individual exited the bus at the next stop. *Id.* Juror Number Three then told all the other jurors of the incident and that the unknown relative was previously in the trial audience. *Id.* Consequently, the trial court conducted individual colloquies of every juror regarding what they heard, if they were frightened, and whether they would

still be able to deliberate fairly and impartially in this matter. *Id.* at 3-5, 13. Juror Number Eleven, when questioned about the incident, stated, "I think it looks bad for [Johnson]." *Id.* at 25.

Juror Number Two indicated that all the jurors were concerned with whether there would be sheriffs and protection at the conclusion of trial. *Id.* at 10. Juror Number Two also stated:

> I think we are all thinking about things a little differently than we were before[,] but when somebody is sitting in that room and they see who you are all day long for five days, frankly, against your will, it doesn't really matter[,] right[?] They already know who you are if they wanted to pursue [something].

*Id.* at 9.

Juror Number Six stated they were very uncomfortable continuing the case. *Id.* at 16. Juror Number Six also stated that someone approached them in the courthouse the day before, inquiring whether that juror was going to the Broad Street Line. *Id.* at 16-17. After conducting the individual colloquies, the court excused Jurors Number Three and Number Eleven and replaced them with the alternate jurors. *Id.* at 25.

Johnson moved for a mistrial afterwards, arguing that the jury had "been poisoned" and the events could "influence [the jury] in some way during jury deliberations." *Id.* at 32. The trial court denied Johnson's motion, stating the remaining jurors had all confirmed they were not scared and were still able to be fair and impartial. *Id.* The court presented a cautionary instruction to the jury to not hold Johnson accountable for actions of the third parties and

"that [the] incident had nothing to do with [Johnson] because [Johnson] was here in this building with his attorney at that particular time. . . . He has no control over what outside people decide to do and that shall have no part of your deliberations in this case." *Id.* at 43.

On February 14, 2020, Johnson was found guilty by a jury of the above-listed offenses. The court sentenced Johnson to eighteen to thirty-six years of incarceration for third-degree murder and no further penalty on the remaining convictions.

On October 13, 2020, Johnson filed post-sentence motions which were denied on November 13, 2020. On December 11, 2020, Johnson filed a notice of appeal. The trial court and Johnson subsequently complied with Pa.R.A.P. 1925.

On appeal, Johnson raises three issues for our review:

1. Whether the evidence presented at trial was insufficient to sustain a verdict of guilty as to the charge of [m]urder of the [t]hird [d]egree[.]

2. Whether the verdict of the jury was against the weight of the evidence[.]

3. Whether the trial court erred in denying [Johnson]'s motion(s) for a mistrial[.]

Appellant's Brief, at 5.

Johnson first argues that the evidence was insufficient to sustain his third-degree murder conviction. Johnson points out that Nichols testified he could not see well in the dark, and, at the preliminary hearing, Nichols testified

that there were three individuals in the alleyway rather than the two individuals he testified to at trial. Appellant's Brief, at 24; N.T. Jury Trial, 2/11/20, at 185. Johnson also focuses on the inconsistencies between Stewart's statements to detectives and her trial testimony, such as her initially telling detectives that Nichols told Cunningham to "chill out" just prior to the gunshot, but at trial, Stewart testified that she could not remember if Nichols was present at that time. Appellant's Brief, at 25; N.T. Jury Trial, 2/12/20, at 53-54.

The standard of review for a challenge to the sufficiency of the evidence is well-settled:

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted). This Court accepts as true all direct and circumstantial evidence, and all reasonable inferences, from which the jury could have based their verdict. *Commonwealth v. Sexton*, 222 A.3d 405, 416 (Pa. Super. 2019); *Commonwealth v. Perez*, 931 A.2d 703, 706-07 (Pa. Super. 2007).

- 9 -

To prove a defendant guilty of third-degree murder, the Commonwealth must show the defendant killed another with malice. *Commonwealth v. Fisher*, 80 A.3d 1186, 1191 (Pa. 2013). Malice may be found where the defendant acts with "ill-will, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty." *Id.* The Commonwealth must show that the defendant "consciously disregard[ed] an unjustified and extremely high risk that his actions might cause death or serious bodily harm." *Commonwealth v. Golphin*, 161 A.3d 1009, 1018 (Pa. Super. 2017). Malice may be inferred from the use of a deadly weapon on a vital part of the body. *Commonwealth v. Seibert*, 622 A.2d 361, 364 (Pa. Super. 1993).

Here, Johnson's claims of inconsistency only serve to question the credibility of Johnson and Stewart, but this argument goes to the weight of the evidence and not sufficiency, and we accept the credibility determinations as found by the jury as factfinder. *Commonwealth v. Troy*, 832 A.2d 1089, 1092 (Pa. Super. 2003). Nichols' testimony—which is corroborated by Stewart's testimony as well as video surveillance—that Johnson and Cunningham argued and physically struggled before Johnson pulled out a gun and Cunningham was shot, establishes a reasonable foundation for the jury to believe Johnson killed Cunningham. *Widmer*, *supra*; N.T. Jury Trial, 2/11/20, at 75-85, 250-83; *id.*, 2/13/20, at 41-76, 183-200, 223-34. Further, evidence was presented at trial which would allow the jury to reasonably infer malice: (1) Nichols testified that Johnson had been in an

argument that night and seemed panicked; (2) Stewart testified that Johnson left the shooting saying, "F[*c@] that [N-word]"; (3) Johnson told Cunningham, "I should have f[*c@]ed you up the last situation," and, (4) the medical examiner testified that the muzzle of the gun was pressed against Cunningham's neck before being fired. **See Fisher**, **supra**; **Seibert**, **supra**; **see also Commonwealth v. Young**, 431 A.2d 230, 232 (Pa. 1981) (defendant pointing gun at defendant's chest and firing without knowing whether gun was loaded was sufficient to establish malice); N.T. Jury Trial, 2/11/20, at 75-80, 85, 125-26, 226; **id.**, 2/12/20, at 7-36. Indeed, it is of no moment that none of the trial witnesses testified to physically seeing Johnson shoot Cunningham. **See Sexton**, **supra**; Appellant's Brief, at 23. We conclude that there was sufficient circumstantial evidence presented at trial for the jury to find each element of third-degree murder beyond a reasonable doubt. **Widmer**, **supra; Sexton**, **supra**.

Johnson's second claim on appeal is that the trial court abused its discretion by failing to find the jury's verdict was against the weight of the evidence. Johnson argues that the key testimony of Nichols and Stewart materially differ from each of their prior accounts given to the court and law enforcement. Appellant's Brief, at 26. Johnson argues Nichols' testimonial inconsistencies include: (1) how long Nichols knew Cunningham;[8] (2) whether

---

[8] N.T. Jury Trial, 2/11/20, at 164.

Johnson pointed a gun at Nichols;[9] (3) whether Johnson tried to take any items from Cunningham;[10] (4) whether Nichols was aware of Johnson's name or nickname at the time of the incident;[11] (5) whether Nichols removed evidence from the crime scene;[12] (6) whether Nichols initially drove to Shabazz's house on Rosalie Street;[13] (7) whether Nichols passed keys to an unidentified bald-headed male;[14] (8) whether Nichols and the unidentified bald-headed male tampered with the crime scene; (9) whether Nichols knew the identity of the bald-headed male;[15] (10) whether Nichols observed Johnson struggle with Cunningham prior to the shooting;[16] (11) the number of people present in the alleyway immediately prior to the shooting;[17] and (12) whether Nichols could tell the relative position of Johnson and Cunningham prior to the gunshot. Appellant's Brief, at 26. Johnson further argues that Stewart cannot be trusted as a witness because she testified that

---

[9] *Id.* at 183.

[10] *Id.* at 173.

[11] *Id.* at 84, 169-171.

[12] *Id.* at 211-12, 217-18.

[13] *Id.* at 181-82.

[14] *Id.* at 187-88.

[15] *Id.* at 211, 215-18.

[16] *Id.* at 185-86.

[17] *Id.*

she was intoxicated both at the time of the shooting and during her statement to the police. *Id.*; N.T. Jury Trial, 2/12/20, at 41-42.

We review weight of the evidence claims using an abuse of discretion standard. *Widmer*, 744 A.2d at 753. "The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Johnson*, 668 A.2d 97, 101 (Pa. 1995). A trial court's denial of a weight of the evidence claim is one of the least assailable reasons for denying a new trial. *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013). A new trial should be awarded only when "the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id.* (internal quotation omitted). When reviewing weight of the evidence, "an appellate court must first determine whether the trial judge's reasons and factual basis can be supported. Unless there are facts and inferences of record that disclose a palpable abuse of discretion, the trial judge's reasons should prevail." *Id.* at 1056.

The trial court found that the jury's verdict was not against the weight of the evidence, stating:

> [Johnson]'s claim significantly misrepresents the record and is disingenuous.
>
> Karon Nichols' account of the events remained materially consistent from his statement to homicide detectives, given the night of the murder, to the preliminary hearing, and to trial. Nichols identified the gun used by [Johnson] as a revolver. Nichols

- 13 -

even recalled, specifically, that he recognized the gun as a revolver because of the "spinning thing." N.T. [Jury Trial], 2/11/20[,] at 127. This is consistent with Officer Taggart's testimony that no fired cartridge casings were found at the crime scene[] since none would be automatically expelled from a revolver. Additionally, the autopsy of [Cunningham] revealed a muzzle mark around the gunshot wound on [Cunningham]'s neck. This is consistent with the fact that Nichols witnessed [Johnson] in close contact with [Cunningham] when he fired his gun.

Even more, Khiana Stewart's account of events clearly corroborated Nichols' testimony. From where Stewart sat the evening of the murder, she witnessed four individuals: [Johnson], [Cunningham], Nichols, and an unidentified male arguing in an alley. Stewart saw [Johnson] pull a gun from his waistband, knock [Cunningham] to the ground, and tell [Cunningham] to give him everything he had. Similarly, Nichols testified that [Johnson] pointed the gun at [Cunningham] and demanded he empty his pockets. Both Nichols and Stewart heard a single gunshot and watched [Cunningham] walk toward Rising Sun Avenue, and [Johnson] run in the opposite direction, away from Rising Sun Avenue.

Still images from the surveillance footage taken from the deli on the corner of rising Sun Avenue and Rosalie Street, show [Cunningham] on the ground surrounded by people, including Nichols and Stewart. In the image, Nichols appears to be on his phone, further corroborating his testimony that once he saw [Cunningham] bleeding on the sidewalk, he called 911. Finally, [Johnson] and the unidentified male were seen on the same surveillance footage minutes before the shooting. Significantly, the description Captain Bullick gave of the clothing of the two males seen running near Cheltenham Avenue matches what [Johnson] was wearing in the surveillance footage.

With two independent eyewitnesses, both offering corroborating testimony, and positively identifying Johnson as the shooter, the verdicts of guilty for third-degree murder and weapons offenses, are clearly supported by the weight of the evidence.

Trial Court Opinion, 2/19/21, at 12-13.

Here, we conclude that the trial court's reasoning, factual basis, and decisions are supported by the record. *Clay*, *supra*; N.T. Jury Trial, 2/11/20,

at 70-120, 239-70; *id.*, 2/12/20, at 7-36, 144-46, 74-80; *id.*, 2/13/20, at 29-71. The inconsistencies Johnson alleges are both exaggerated and immaterial. Most of Johnson's arguments only serve to question the jury's credibility findings which were fairly determined after hearing cross-examination. ***Johnson***, ***supra***; ***see Commonwealth v. Small***, 741 A.2d 666, 672-73, 677 (Pa. 1999) (inconsistent witness statements, memory problems of witnesses, drug and alcohol use of witnesses on night of murder, and coercive police tactics did not require trial court to find verdict against weight of evidence). Johnson does not cite to anything in the certified record that would support his claim that Nichols or the bald-headed man tampered with the crime scene. The testimony elicited at trial, which was corroborated by the surveillance video, failed to support the claim that the bald-headed man or Nichols tampered with the crime scene as it relates to the charges brought; there was only evidence that they removed marijuana from the scene of the crime. N.T. Jury Trial, 2/11/20, at 187-88, 217-18. The trial court properly applied the law and was within its discretion to find that the verdict was not against the weight of the evidence. ***Clay***, ***supra***; ***Widmer***, ***supra***.

Johnson's third issue on appeal is that the trial court should have granted his motions for a mistrial. Johnson argues the trial court should have granted his first motion for a mistrial after the Commonwealth asked Nichols about his relocation. Appellant's Brief, at 30. Johnson also argues that Jurors Number Two and Number Six should have been dismissed from the jury. ***Id.*** at 37. Even without the removal of Juror Number Six, Johnson argues the

court should have granted the second motion for mistrial because the jurors discussed Juror Number Three's bus encounter at length. *Id.*

We review the trial court's denial of a motion for mistrial using an abuse of discretion standard. *Commonwealth v. Bryant*, 67 A.3d 716, 728 (Pa. 2013). Mistrial may only be granted "where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Id.* (quotations marks and citation omitted). "If in reaching a conclusion, the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will . . . discretion is abused." *Commonwealth v. Wright*, 961 A.2d 119, 142 (Pa. 2008). A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice. *Commonwealth v. Chamberlain*, 30 A.3d 381, 421 (Pa. 2011). Likewise, juries are presumed to follow a trial court's instructions. *Commonwealth v. Risoldi*, 238 A.3d 434, 458 (Pa. Super 2020). Whether or not a juror will be able to put aside biases and eliminate influences can be gleaned from their answers to questions and demeanor. *Commonwealth v. Cox*, 983 A.2d 666, 682 (Pa. 2009).

A defendant has a right to have his case heard by a fair, impartial, and unbiased jury and "contact among jurors, parties, and witnesses is viewed with disfavor." *Commonwealth v. Winstead*, 547 A.2d 788, 792 (Pa. 1988). There is no *per se* rule requiring mistrial whenever there is improper or inadvertent contact between a juror and a witness or third party, rather such

contact is addressed primarily at the discretion of the court. **Commonwealth v. Mosley**, 637 A.2d 246, 249 (Pa. 1993); **Commonwealth v. Meredith**, 221 A.3d 186, 191-92 (Pa. Super. 2019).

Regarding, Johnson's first motion for mistrial, the trial court concluded that no new trial was warranted because:

> The jury heard no testimony indicating Nichols was relocated nor that the witness was intimidated in any way. Even more, by defense counsel's own admission, that line of questioning went no further, and he wished that no further attention be drawn to the topic. A mistrial would not have been appropriate in this instance. The court took the curative measure of prohibiting any further questioning regarding relocation from the Commonwealth. The jury remained more than capable of weighing the evidence and rendering a fair verdict.

Trial Court Opinion, 2/19/21, at 16.

Here, we agree with the trial court and conclude that the Commonwealth's brief, unanswered question regarding Nichols' relocation did not prejudice Johnson because the jury was warned before the trial commenced that questions are not evidence, **see Risoldi**, **supra**, and no answer was elicited. N.T. Jury Trial, 2/11/20, at 26. Thus, the jury did not consider the question to be evidence. **See Commonwealth v. Tilley**, 595 A.2d 575, 581 (Pa. 1991) (unanswered prior bad acts question was cured by instruction that questions are not facts). Moreover, as the trial court noted, the jury did not hear any evidence regarding intimidation because such discussions took place outside the presence of the jury. Trial Court Opinion, 2/19/21, at 14-15; **id.**, 2/11/20, at 149. Thus, there was no abuse of

- 17 -

discretion when the trial court denied Johnson's first motion for a mistrial. *Wright*, *supra*.

Moreover, even if an answer had been elicited, the question was not necessarily inappropriate as evidence explaining possible inconsistent statements by a witness is permissible. *Commonwealth v. Mollett*, 5 A.3d 291, 309 (Pa. Super. 2010) (Commonwealth asking witness if she entered relocation, implying abuse and witness intimidation, was appropriate and did not require mistrial); *see also Commonwealth v. Johnson*, 668 A.2d 97, 104 (Pa. 1995) (generally admissible testimony does not warrant mistrial). Additionally, we are satisfied that Johnson voluntarily declined further curative instructions by the court. *See Chamberlain*, *supra*.

Regarding Johnson's second mistrial motion, which related to Juror Number Three's interaction with a trial observer on the bus, the trial court explained:

> Here, each juror who remained on the jury confirmed that they would be able to render a fair and impartial verdict. Even more, each expressed that they did not feel scared or intimidated after hearing of the incident with Juror Number Three. Therefore, the [trial court]'s cautionary instruction given to the jury prior to deliberations cured any prejudice which [Johnson] may have faced[,] and the motion for a mistrial was rightly denied.

Trial Court Opinion, 2/19/21, at 17.

Again, we agree with the trial court. All of the remaining jurors indicated their ability to remain fair and impartial. *See Cox*, *supra*; *Wright*, *supra*; *see also Meredith*, *supra* (jury contact by defendant's father provoking

- 18 -

discussion about safety did not warrant mistrial after jurors indicated their ability to remain impartial); N.T. Jury Trial, 2/14/20, at 32. The trial court sufficiently cured any prejudice or bias against Johnson by removing Jurors Number Three and Number Eleven and instructing the jury "that [the] incident had nothing to do with [Johnson] . . . and that shall have no part of your deliberations in this case." *See Chamberlain*, *supra*; N.T. Jury Trial, 2/14/20, at 43. There was no evidence that Johnson had ever been involved in any witness intimidation and Johnson was still in the courtroom with no cellphone when Juror Number Three was contacted. N.T. Jury Trial, 2/14/20, at 30-32. Finally, it is apparent from the trial transcript that the statements of Jurors Number Two and Number Six were concerned with safety rather than indicating any bias, and someone approaching Juror Number Six about whether they were going to the Broad Street Line would hardly create any bias or prejudice towards Johnson. N.T. Jury Trial, 2/14/20, at 9-17. Thus, there was no abuse of discretion when the trial court denied Johnson's second motion for a mistrial. *Wright*, *supra.*

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/09/2021

- 19 -